221 F.Supp. 19 (1963)
BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, Plaintiff,
Railway Labor Executives' Ass'n, Intervenor Plaintiff,
Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, the International Ass'n of Machinists, and the Brotherhood of Railway Carmen of America, Intervenor Plaintiffs,
v.
UNITED STATES of America and Interstate Commerce Commission, Defendants,
Baltimore & Ohio Railroad Company, Intervenor Defendant,
Chesapeake & Ohio Railway Company, Intervenor Defendant.
No. 23467.
United States District Court E. D. Michigan, S. D.
August 13, 1963.
*20 *21 McClintock, Fulton, Donovan & Waterman, Harry A. Carson, James I. McClintock, Detroit, Mich., Mulholland, Robie & Hickey, Richard R. Lyman, Toledo, Ohio, William G. Mahoney, Washington, D. C., for plaintiffs.
Rhyne & Rhyne, Charles S. Rhyne, George A. Wray, Max Malin, Washington, D. C., Romanoff, Cavanagh, Nelson, Noonan, Costello & Toohey, Oliver C. Nelson, John F. Noonan, Robert E. Toohey, Detroit, Mich., for intervening plaintiffs.
Robert F. Ritzenhein, Asst. U. S. Atty., Detroit, Mich., Joel E. Hoffman, Anti-Trust Div., Dept. of Justice, Washington, D. C., for United States.
Robert Ginnane, Gen. Counsel, Fritz R. Kahn, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.
Kenneth H. Ekin, Gen. Counsel, Baltimore, Md., Bodman, Longley, Bogle, Armstrong & Dahling, Carson C. Grunewald, Richard D. Rohr, Detroit, Mich., for Baltimore & O. Ry.
Walter A. Kleinert, Detroit, Mich., Joseph C. Kauffman, Vice Pres., Chesapeake & O. Ry. Co., William R. Althans, Gen. Counsel, Cleveland, Ohio, Edward K. Wheeler, Robert G. Seaks, Washington, D. C., for Chesapeake & O. Ry. Co.
Before O'SULLIVAN, Circuit Judge, and THORNTON and ROTH, District Judges.
O'SULLIVAN, Circuit Judge.
This statutory three-judge court was convened upon the filing of a complaint by the Brotherhood of Maintenance of Way Employees against the United States and the Interstate Commerce Commission. 28 U.S.C.A. §§ 1336, 1398, 2284 and 2321-2325. The complaint attacks the validity and sufficiency of the report and order of that Commission which, pursuant *22 to 49 U.S.C.A. § 5(2), approved, under specified conditions, the acquisition by the Chesapeake & Ohio Railway Company of capital stock control of the Baltimore & Ohio Railroad Company. The Commission also approved the issuance by the C & O of the required number of shares of its own authorized stock in exchange for capital stock of the B & O. 49 U.S.C.A. § 20(a). The Commission's report is styled Chesapeake & Ohio Railway Company  Control  Baltimore & Ohio Railroad Company, 317 I.C.C. 261 (1962). Subsequent to the filing of the complaint, the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, and others, were allowed to intervene as parties plaintiff, and the above mentioned railroads were permitted to intervene as parties defendant. We shall refer to the C & O acquisition of B & O stock as the C & O-B & O affiliation.
Broadly stated, the attack upon the Commission's report and decision is bottomed upon plaintiffs' and intervenors' contentions that the report contained insufficient findings upon which to base its conclusion; that the Commission gave inadequate consideration to the effect of the affiliation upon other railroads and railroad employees, and upon the public; and that the Commission erred in denying motions made by intervening opponents of the C & O application to defer decision on the matter and to consolidate the hearing before it with other pending matters.[1] The Department of Justice supported such motions.[2] The other matters pending were the merger application of the New York Central Railroad Company and the Pennsylvania Railroad Company, and the unification application of the New York, Chicago and St. Louis Railroad Company (The Nickel Plate), the Wabash Railroad Company and the Norfolk & Western Railroad Company. These applications are pending before the Commission, and are at intermediate stages in the hearings necessary to final decision.
It should be preliminarily observed that there is little dissent from recognition that if the railroads of this country are to survive as instrumentalities to adequately serve the transportation needs of the country, mergers of the large and small railroads in various groupings will have to take place. The record before us seems to make clear that this trend to merger will likely eventuate in there being substantially fewer independently operating railroad systems serving the northeast quadrant of the United States than now exist. It may be that the ultimate grouping into these major railroad systems will follow the lead made by the larger railroads now applying for approval of plans presently before the Commission. It should be borne in mind, however, that the Transportation Act of 1940, 54 Stat. 899, 49 *23 U.S.C.A. § 1 et seq., does not give to the Commission or to the courts any power to compel the regrouping of the railroads involved, or to require any railroad to merge or join with any other railroad. St. Joe Paper Co. v. Atlantic Coast Line R. Co., 347 U.S. 298, 305, 74 S.Ct. 574, 98 L.Ed. 710, 719. As early as 1920, Congress recognized that the health of our railroads could only be protected by merging into fewer systems the facilities and economic power of the great number of railroads then in existence in the United States. To serve that end, Congress enacted the Transportation Act of 1920, which directed the Interstate Commerce Commission to consider the problems of consolidation, make the necessary investigations, and to go forward with a national plan for bringing about such a reorganization of the railroads of this country. The Transportation Act of 1920 directed the Commission to "prepare and adopt a plan for the consolidation of the railway properties of the continental United States into a limited number of systems". 41 Stat. 481. No good purpose would be served by here detailing the history of the efforts of the Commission and Congress to provide for compulsory reorganization of the country's railroads. A summary of that history may be found appended to the opinion of the Supreme Court in St. Joe Paper Co. v. Atlantic Coast Line R. Co., 347 U.S. 298, 315-321, 74 S.Ct. 574, 98 L.Ed. 710, 724-727. Suffice it to say that by 1940 it was apparent to both the Commission and Congress that the national plan was a failure. Schwabacher v. United States, 334 U.S. 182, 193, 68 S.Ct. 958, 92 L.Ed. 1305, 1313. Congress then took a new approach in the Act of 1940 by authorizing that the needed mergers be initiated and carried out by the voluntary and private action of the railroads involved, subject always to the supervision and approval of the Interstate Commerce Commission. Schwabacher v. United States, 334 U.S. 182, 193, 68 S.Ct. 958, 92 L.Ed. 1305, 1313. It might be well to mention at this time that during the year 1962, interested parties sought to have Congress declare a moratorium upon the accomplishment of mergers of railroads with assets in excess of $200,000,000.00, unless the mergers met the standards of the anti-trust laws. Although extensive hearings were conducted, at which both proponents and opponents of the Interstate Commerce Commission's case-by-case approach to the merger problem were heard, no legislation has emerged from the proposal. See, Hearings on S. 3097 Before a Sub-committee of the Senate Committee on the Judiciary, 87th Cong., 2d. Sess. (1962).
The action of the C & O and B & O railroads here under consideration was initiated by these railroads pursuant to the 1940 Act. The Commission, in considering the application of the C & O for control of the B & O, was bound to consider whether or not the sought for control would be consistent with the present policy of Congress, and whether or not it would be detrimental to or inconsistent with the public interest, the interest of labor, and whether overall desirable ends would be served by allowing a reorganization of railroads through stock acquisition, mergers, and otherwise. See, New York Central Securities Corp. v. United States, 287 U.S. 12, 25, 53 S.Ct. 45, 77 L.Ed. 138, 146; McLean Trucking Co. v. United States, 321 U.S. 67, 87, 64 S.Ct. 370, 88 L.Ed. 544, 556-557.
The pertinent statutory authority under which the attacked action was taken, Title 49 U.S.C.A. § 5(2), sets forth in subparagraph (c) thereof the matters that must be considered by the Commission before approving such action:
"(c) In passing upon any proposed transaction under the provisions of this paragraph, the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the *24 total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected."
Subparagraph (b) of § 5(2) authorizes approval of a proposed transaction, if the Commission finds that it "will be consistent with the public interest". In its report, the Commission asserts that it found the proposed affiliation consistent with the public interest, and that it took into consideration all of the above matters required of it and sets forth in extensive detail its review of the evidence, its appraisal thereof, and the weight given to it. It made findings of fact from that evidence and concluded that all of the criteria necessary for its approval of the C & O-B & O affiliation had been established. Commissioner Tucker, with the concurrence of Commissioner Webb, dissented.[3] Commissioner Bush filed a separate dissent, limited to his position that the C & O-B & O matter should be heard only as a merger proposal, and consolidated for decision with the PRR-NYC and the N & W-Nickel Plate cases.
In this lawsuit, our review of the Commission's action is a limited one. We do not start anew and, on the basis of our own judgment, determine whether acquisition of control of the B & O by the C & O should be approved. Congress has committed that judgment to the discretion of the Commission. Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 188-189, 80 S.Ct. 229, 4 L.Ed. 2d 223. We are limited to determining whether any errors of law were made by the Commission, whether its action was arbitrary, capricious, or an abuse of its discretion, and, upon review of the whole record, whether its findings of fact are supported by substantial evidence. Title 5 U.S.C.A. § 1009(e); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. See also, General Motors Corp. v. United States, 207 F.Supp. 641, 643-644 (E.D.Mich., 1962); United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260. If the findings of the Commission are supported by substantial evidence on the whole record, we may not set them aside. Likewise, the weighing of the evidence is reserved exclusively for the Commission. United States v. Carolina Freight Carriers, 315 U.S. 475, 490, 62 S.Ct. 722, 730, 86 L.Ed. 971, 983. It is not within the province of the reviewing court "to substitute inferences of its own for those drawn by the Commission from testimony and * * to weigh anew conflicts in it." Chicago St. P., M. & O. R. Co. v. United States, 322 U.S. 1, 3, 64 S.Ct. 842, 88 L.Ed. 1093, 1095.
The primary question before us is whether the findings of the Commission are supported by substantial evidence on the whole record. As discussed more fully below, we hold that they are.

1. ADEQUACY OF THE COMMISSION'S FINDINGS[4]
The Commission found that the B & O Railroad was in precarious financial condition. Its trackage, its rolling stock and other equipment had reached such a state of disrepair and inadequacy that its continued existence as a transportation facility was in serious jeopardy unless adequate financing and other help could be obtained to restore it to economic and physical health. The Commission *25 concluded that the B & O railroad could not, by its own resources or by its borrowing power, obtain needed financing. This finding was supported by substantial evidence in the record made before it. There was evidence, and the Commission found, that the C & O, with control of the stock of the B & O, was in a position, by the use of its own resources and credit, to provide the means whereby the B & O could recover from its depressed condition and be restored to a healthy and economically sound transportation system. In addition to direct financial support to the B & O, the Commission found from evidence before it that the affiliation sought would provide opportunity and motivation for cooperative effort by the C & O and B & O; that substantial economies could be effected by the use of joint facilities and personnel and the pooling of equipment; and that such accomplishments would permit the B & O to "become a stronger railroad and the efficiency and economy of its operations will be increased". The Commission found, on the evidence, that "Strengthened as a result of the control, B & O's ability to meet the needs of commerce and the national defense will be enhanced". We are impressed that there was substantial evidence in the record to support such findings and that such findings add weight to the Commission's ultimate conclusion that the C & O-B & O affiliation was consistent with the public interest.
"* * * the term `public interest' * * * is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities * * *". New York Central Securities Corp. v. United States, 287 U.S. 12, 25, 53 S.Ct. 45, 48, 77 L.Ed. 138, 146.
The most active adversary of the C & O-B & O railroads during the hearings was the New York Central Railroad. It contended that to allow C & O to acquire B & O would cause it irreparable damage in that their combined strength would divert a very substantial portion of the traffic of the New York Central. It had employed experts who made studies of the claimed diversion. They testified to their opinion that the C & O-B & O affiliation would divert 41% of Central's traffic. Such estimate was opposed by evidence offered by the C & O and full play was given to the evidence and arguments upon the issues drawn by the principal adversaries. The Commission's report adequately reviewed the weight it gave to the evidence offered by these adversaries upon the question of the effect of the proposed affiliation upon diversion of traffic, not only upon Central but upon other railroads that might be affected by the operations of the C & O-B & O. The Commission was of the opinion that the conclusion of Central's experts was unwarranted.
It is the contention of the plaintiffs here, however, that the Commission's finding that "no undue amount of traffic will be diverted from Central" is inadequate. They contend that it should have made a specific determination as to how much traffic would be diverted from Central. We cannot agree. The Commission was not required to engage in speculation and guesswork to come up with a precise percentage prediction. In its findings, the Commission carefully reviewed the testimony given by Central's witnesses, gave its reasons why it found their estimates unreliable, and reviewed the evidence supportive of its conclusion that the claimed diversion of traffic from Central would not be undue. The Commission said:
"We have carefully examined the estimates of traffic diversion submitted by Central and by C & O-B & O. They vary widely in their estimates of the amount of traffic subject to diversion and were prepared on different bases. In many respects they are not comparable. Based on these estimates, their background material, and other information of record, including particularly the effect of the transaction on the Nation's railroads *26 and, in turn, on the public, we conclude that no undue amount of traffic will be diverted from Central. We have found from our past experience in similar proceedings that the diversion of traffic in the volume predicted rarely, if ever, occurs. Although we realize that at present Central is not well able to absorb any substantial loss of traffic, we believe that the benefit to the public from approval here will far outweigh the harm to Central. The findings here specifically provide that interested parties may file applications for modifications of the routing and channels of trade conditions and this would be adequate to protect Central from all except ordinary traffic solicitations to which it is now exposed in the normal course of its business. We conclude that the prospective loss of revenue to Central is not such as to require disapproval here." 317 I.C.C. at 282, 283.
We are of the opinion that this was sufficient.[5] Cf., McLean Trucking Co. v. United States, 321 U.S. 67, 89, 64 S.Ct. 370, 88 L.Ed. 544.
A further contention of the plaintiffs is that even though the Commission considered the question of diversion of traffic from New York Central, it did not extend its consideration to the amount of traffic that will be diverted from other railroads not parties to the proceeding. We find that early in its report the Commission said, "As indicated hereinafter, it does not appear that there will be any undue diversion of traffic from Central by reason of the C & O-B & O affiliation or that any rail Carrier will be unduly injured. It is significant that no other railroad seeks to be included in the C & O-B & O control transaction. * * * We conclude later herein that approval of the control in this proceeding will not result in any undue diversion of traffic from Central or other rail carriers". (Emphasis supplied) 317 I.C.C. at p. 265.
In addition to the Commission's right to rely on its own expertise and judgment, Market Street R. Co. v. Railroad Com. of Cal., 324 U.S. 548, 560, 561, 65 S.Ct. 770, 89 L.Ed. 1171, it had substantial evidence before it from which to draw its conclusion that neither from the standpoint of competition nor diversion of traffic would other railroads be unduly prejudiced by approval of the C & O application. Representatives of a large number of the major shippers using the eastern railroads testified that the C & O-B & O affiliation would not cause any change in their habits of choosing rail carriers for their traffic. These witnesses did not limit their observations to diversion of traffic from the New York Central, but included eastern rail carriers generally in their opinions. Shippers are the primary source of all freight traffic and their opinions are, accordingly, of impressive weight. In addition to such testimony, informed representatives of the C & O and B & O testified that the control sought would not result in substantial diversion of traffic from their rail competitors. The briefs of plaintiffs here do not persuade us that such evidence was seriously impeached and the credibility of such witnesses and the weight of their testimony were for the Commission.
In addition to the Commission's findings, quoted above, it further expressed itself on the subject as follows:
"On this record, there appears to be no reasonable basis for the conclusion that control of B & O by C & O would seriously affect the ability of Central or any other carrier to provide adequate transportation to the public." 317 I.C.C. 284.
"No other rail carrier will be placed at such a competitive disadvantage or otherwise unduly affected as a result of the transaction as to warrant disapproval. No other carrier has asked to be included in the transaction and there is no evidence *27 of record showing that the public interest requires the inclusion of any other carrier." 317 I.C.C. 292.
"Thus, we must estimate the scope and appraise the effects of curtailment of competition which will result from the proposed control and consider them along with the advantages of improved service, safer operation, lower costs, et cetera, to determine whether the control will assist in effectuating the overall transportation policy. Suffice it to say that we have herein considered and discussed the referred to factors and we conclude that the control will assist in effectuating the overall transportation policy." 317 I.C.C. 292.
We hold that the Commission did give consideration to the effect of the affiliation on other railroads, that it made adequate findings on the subject and that such findings were supported by substantial evidence.[6]
Plaintiffs further attack the Commission's report by arguing that the Commission's report is fatally deficient in that it lacks adequate subsidiary findings. Section 8(b) of the Administrative Procedure Act, 5 U.S.C.A. § 1007(b), provides that decisions of administrative tribunals shall include a statement of findings and conclusions, as well as the reasons or basis therefor, upon all material issues of fact, law, or discretion. This statutory provision requires subsidiary findings only upon those issues which are material, but not those which are collateral. Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 193-194, 80 S.Ct. 229, 4 L.Ed.2d 223. To comply with this rule, it is enough if an administrative agency, such as the Interstate Commerce Commission, sets forth in its decision a reasonable review of the evidence before it, the weight which has been given to such evidence, its own resolution of the conflicts therein, and expresses its findings and conclusions necessary to support its ultimate findings. Alabama Great Southern R. Co. v. United States, 340 U.S. 216, 227-228, 71 S.Ct. 264, 95 L.Ed. 225, 237; Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 193, 80 S.Ct. 229, 4 L.Ed.2d 223. The findings expressed by the Commission in its report sufficiently exposed its view of the evidence and the basis upon which it came to its ultimate conclusion that the criteria essential to approval were present and established by the proofs made before it on its extended hearing. We are of the opinion that the findings it made were adequate to support its order.

2. ADEQUACY OF INVESTIGATION AND HEARING
The C & O's application to acquire control of the B & O initiated the involved proceeding.[7] The following parties, among others, intervened and participated in the proceedings, to wit: the United States Department of Justice, the states of Massachusetts, Michigan, New York, Ohio, the Maryland Port Authority, the New York Port Authority, cities such as Battle Creek, Michigan, Centralia, Ohio, Erie, Pennsylvania, Evansville, Indiana, and New York City, dozens of shippers, and the Chicago and Eastern Illinois Railroad, Boston & Maine Railroad, Pittsburgh & Lake Erie Railroad, New York Central Railroad, and the Railway Labor Executives Association. The Department of Justice was present at, and participated in, the hearing *28 through representatives from the office of the Attorney General of the United States; the New York Central Railroad and Railway Labor Executives' Association, the latter a plaintiff here, were there by their counsel, all of whom took some part in the hearings, either before the Commission Examiner or the full Commission, or both. The Railway Labor Executives' Association represents all of the railroad brotherhoods of the operating railroads in the United States and, through these, substantially all of the railroad employees of the American railroads.
It is contended here by plaintiffs that the Commission should have taken more evidence than it did; that it should have, on its own initiative, employed independent counsel, accountants and other experts, to investigate and to test the sufficiency of the evidence offered before it by the various parties. We should, initially, observe that no interested party was foreclosed from offering any evidence that it wished to offer. Railway Labor Executives' Association, intervenor there and here, offered the testimony of sixteen witnesses. No counsel present was denied the opportunity to cross-examine witnesses, and at no time during the hearing did any of the plaintiffs, or the Department of Justice, urge upon the Commission that it employ special counsel, accountants or other investigators to test the soundness of the evidence that was being offered by the railroads applying for its order of approval.
In their contention in this regard, plaintiffs properly assert that the Interstate Commerce Commission occupies a somewhat different position than the ordinary tribunal in that it is charged with the affirmative duty to look into and consider the interest of the public, and, in some measure, to thus be an advocate for the public interest. However, there is nothing in the statute requiring the Commission to actively promote opposition to applicants before it by hiring independent counsel or experts. A lack of confidence in the reliability and adequacy of the showing made before it may, indeed, prompt it to take such action. In this case, however, there were extended hearings with able adversaries exploring all facets of the issues involved; in addition to the Commission's own concern for it, the public interest was represented by the office of the Attorney General of the United States; the Commission found that the evidence supporting the application was of such quality, credibility and accuracy as to persuade it that the public interest would be served by approving such application. In this context, it can hardly be said that the Commission's discretion was abused in its failure to have undertaken, by counsel and experts employed by it, an adversary attack upon the case made before it. Its concern for the public interest does not require the Commission to employ a "devil's advocate" to attempt destruction of evidence which it finds adequate and reliable.
We are not sure that we understand plaintiffs' complaint, first made here, as to the Commission's failure to, itself, employ so-called independent counsel and other experts. Should we assume that such neutrals would have been more successful in exposing some invalidity in the C & O-B & O position than the impressive array of advocates who opposed the application? Is it thought that some special counsel would exhibit greater concern for, and employ greater ability to protect, the public interest than the Commissioners themselves, and other participants who stood watch over the proceedings?

3. EFFECT OF CONTROL UPON EMPLOYEES
Plaintiff, Brotherhood of Maintenance of Way Employees, and intervenor, Railway Labor Executives' Association, do not specifically attack that portion of the Commission's report which provides for the protection of the employees of the involved railroads as required by subsection (f) of Section 5(2), Title 49 U.S.C.A. The conditions imposed by the instant order were of broader scope than those imposed by the *29 Commission in approving the merger of the Delaware-Lackawanna & Western railroad company with the Erie Railroad. The latter conditions were found sufficient in the case of Brotherhood of Maintenance of Way Employees v. United States, 189 F.Supp. 942 (E.D.Mich., 1960) affirmed 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206. The plaintiff unions, however, attack the present order because of its claimed threatened injury to employees of the C & O and B & O, and to railroad employees generally. At the time of the filing of the complaint herein, plaintiff sought, and obtained, a restraining order which substantially prevents the displacement of any of the employees of the C & O and B & O pending this Court's determination of this cause. Such restraining order has continued in effect up to the present time.
Plaintiffs now contend that the Commission did not give adequate consideration to the interests of employees, and that the evidence adduced gives warning of such injurious effects on employees that the plan should be struck down by denying the application without reference to the sufficiency of attached employee-protection conditions. In this regard, we quote from the Commission's decision and findings concerning the effect of the sought for approval upon the railroad employees. After making various estimates as to the number of employees who would be displaced and the additional persons who would be employed, the Commission said:
"Over the past decade, the financial condition of B & O has resulted in frequent and extended furloughs of many of its employees. Employment conditions on the C & O have been much better. In the long run, the C & O-B & O affiliation will undoubtedly provide more job security. We realize, however, that consummation of the transaction will cause a substantial hardship to a number of employees and their families, and to some extent adversely affect business conditions in their communities. But we are not persuaded that the application should be denied for this reason. As a result of the affiliation, B & O's ability to render an efficient transportation service on a sound financial basis will unquestionably be strengthened. It is our opinion that the advantages that will accrue to the B & O, the C & O, and ultimately to the general public will far outweigh the adverse employee effects which the unification will entail. As we stated in the Southern Control case, `it would not be in the public interest or compatible with the national transportation policy to deny the authority of Central's (Central of Georgia) facilities and the possible loss of jobs incidental thereto'. That statement is equally applicable here." 317 I.C.C. 285, 286.
It is observed that the merger of railroads and unification of their operation will inevitably entail some loss of employees' jobs, but the congressional policy recognizes that it is essential to saving our great transportation system that there be mergers and unifications to accomplish economies and the removal of duplication and unnecessary expense. The accomplishment of this purpose must inevitably have an impact upon the railroad employees. Recognition of this was what prompted Congress to require that no approval should be granted unless provision be made for protection of displaced employees. It is recognized that even though there will be some immediate hurt to railroad employees in the approval of mergers and affiliations, railroad employees, as well as all other members of the public, will, in the long run, find more and better opportunities if the country's total economic health is protected. We cannot say that the conditions imposed by the Commission do not adequately protect the rights of the employees in this situation.

4. FAILURE TO CONSOLIDATE CONTROL WITH MERGER APPLICATIONS
At the outset, we note that whether hearings should be consolidated *30 is a matter committed to the discretion of the administrative agency. American Trucking Association v. United States, 326 U.S. 77, 83, 65 S.Ct. 1499, 89 L.Ed. 2065, 2070; Federal Communications Comm. v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656, 659. Cf., United States v. Northern Pacific Ry., 288 U.S. 490, 501-502, 53 S.Ct. 406, 77 L.Ed. 914, 921. We are not persuaded that the Commission abused its discretion in this regard or that the public interest was jeopardized by the Commission's disposition of the C & O-B & O affiliation without waiting for the completion of the hearings on the merger applications pending before it, or by its refusal to consolidate all pending applications and to dispose of them in one decision. The Commission's decision exposes its reason for such exercise of discretion. It should be noted too that the C & O application was not for approval of a merger, as were the other proceedings with which it was asked to consolidate this case. The Commission said, "Before C & O and B & O can effect * * * a merger, another application must be filed with this Commission. Approval of the application for C & O to control B & O will not foreclose our opportunity to consider the lawfulness of such a future merger application, nor will it prevent interested parties from raising objections to proposals of that application when it is presented to the Commission for its approval." 317 I.C.C. 265.
The efforts of the plaintiffs here to set aside the Commission's order is bottomed primarily upon a contention that the problems of all the railroads in the northeast quadrant of the United States should be considered together. In our view, such a program would be but a return to a policy that, after long frustration, was found to be unwise, both by the studies made by the Commission and by the Congress of the United States. It cannot be denied that many years were consumed in laborious effort on the part of the Commission to come up with a plan for the re-arrangement of the entire railroad system of the country. At the end of this long period of study and experience, it was the conclusion of those trying to solve the problem that the best solution was to entertain applications initiated by the railroads themselves, and to allow them to attempt, by mergers and affiliations, to slow down and arrest the economic deterioration of the American railroads.
The evidence in this case shows that the B & O, one of the very great railroad systems of the United States, is in critical condition. We think that it would be a disservice to the national policy to hazard the exposing of this railroad to continuing crises by postponing the help that appears to be available to it in the control proposal of the C & O. We cannot predict at this time how many months or years would be consumed in trying to find the perfect, or merely a better, solution of the problems of our eastern railroads, large and small. As stated by Justice Jackson, reviewing the failure of a nationwide plan, "waiting for the perfect official plan was defeating or postponing less ambitious but more attainable voluntary improvements." Schwabacher v. United States, supra, 334 U.S. at p. 193, 68 S.Ct. at p. 964. The Commission is satisfied that the approval of the application before it involving the C & O and B & O will be a definite step forward in solving this great national problem. We are not persuaded that the Commission is wrong. In all events, it is not our function to substitute our judgment for that of the Commission. Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 188, 80 S.Ct. 229, 4 L.Ed.2d 223. The Commission's wisdom and experience, not ours, must determine whether its approval of the C & O-B & O affiliation is consistent with the public interest. McLean Trucking Co. v. United States, 321 U.S. 67, 87, 64 S.Ct. 370, 88 L.Ed. 544.
We are satisfied that the Commission committed no errors of law, that its action was not arbitrary, capricious or an abuse of discretion. We cannot say that its findings of fact are unsupported by substantial evidence on the *31 whole record. While not controlling, we think it significant that no railroad has joined the plaintiffs, intervenors, or the Attorney General in this litigation. If Commission approval of the C & O control of B & O were prejudicial to the interests of other railroads, we might, indeed, expect the self interest of such other railroads, or groups of railroads, to urge them to join in the attack on it.
An order dismissing the complaint and dissolving the temporary restraining order may be presented for signature.
NOTES
[1] These motions were made after the record had been closed. The hearings had extended from June 19 to October 9, 1961. They were held in seven cities, some 394 witnesses were heard, whose testimony resulted in a transcript of 5686 pages and some 550 exhibits were received. Upwards of 100 intervenors appeared, many of whom opposed the C & O applications. More than 60 attorneys appeared for the intervenors.
[2] After the commencement of this cause, the Attorney General of the United States, appearing on behalf of the United States, the statutory defendant, filed an answer which "admits that the order of the Interstate Commerce Commission is erroneous, in that it is not supported by adequate findings upon substantial evidence with respect to the impact upon other railroads of the proposed acquisition * * *." The formal prayer of his answer is "that the order of the Commission be set aside and the case be remanded to the Commission for further proceedings". His briefs and arguments to this court, however, may be fairly read to be his request that such further proceedings include the consolidation of the C & O application with two railroad merger applications now before the Commission, and to withhold decision of the C & O matter until conclusion of the hearings on such other applications, to the end that a contemporaneous decision might be made of all the pending control and merger applications which involve the eastern railroads.
[3] Dissenting Commissioner Tucker agrees that there is critical need for prompt action in railroad rearrangement. Referring to such problem he says, "Seldom has any single problem of the American economy received so much attention from so many sources with so few results. * * * Eastern railroad problems must not be minimized. Prompt and positive action by the Commission has been urgently called for and no doubt is needed." (Emphasis supplied) 317 I.C.C. at 295, 297.
[4] For convenience of discussion, we shall refer to the plaintiff, intervening plaintiffs, and the Department of Justice as the plaintiffs; and to the defendant Commission and the intervening railroads, the C & O and B & O, as defendants.
[5] After the conclusion of the hearing, Central withdrew its opposition to the proposed affiliation, and has not joined the plaintiffs in the case before us.
[6] Special caution was shown by the Commission in this regard by its imposition of "Conditions to insure the maintenance of existing routes and channels of trade" set forth in Appendix VII to its report. (317 I.C.C. 345) Such conditions are designed to prevent injury to other rail carriers, and by them the Commission retains jurisdiction to modify them, upon application, should need therefor arise.
[7] The New York Central filed a rival application to acquire control of B & O or, in the alternative, to participate jointly with C & O in the control of B & O. This application was heard on a consolidated record with that of C & O. Central's application was withdrawn when its proposed merger with the Pennsylvania Railroad was announced.