**FLORIDA EAST COAST RAILWAY COMPANY, a corporation,**
**Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission,**
**Defendants.**

**No. 64–64–Civ. J.**

United States District Court
M. D. Florida,
Jacksonville Division.

May 13, 1965.

See also, D.C., 228 F.Supp. 340.

Frederick H. Kent, Sr., of Ulmer, Murchison, Kent, Ashby & Ball, Jacksonville, Fla., A. Alvis Layne, Washington, D. C., for plaintiff Florida East Coast Ry. Co.

Mahoney, Hadlow, Chambers & Adams, Jacksonville, Fla., Mulholland, Hickey & Lyman, Washington, D. C., for plaintiff in intervention Railway Labor Executives' Assn.

H. P. Osborne, Jr., James E. Cobb, of Mathews, Osborne & Ehrlich, Jacksonville, Fla., and William D. McLean, Washington, D. C., W. Graham Claytor, Jr., D. W. Markham, John K. Mallory, Jr., Washington, D. C., for plaintiffs in intervention Southern Railway Co., and others.

Edward F. Boardman, U. S. Atty., James H. Walsh, Asst. U. S. Atty., Jacksonville, Fla., I. Daniel Stewart, Jr., Atty., Dept. of Justice, Washington, D. C., for defendant United States.

Robert W. Ginnane, Gen. Counsel, Fritz R. Kahn, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendant Interstate Commerce Commission.

Harold J. Gallagher, Walter H. Brown, Jr., New York City, John S. Cox, of Cox, Grissett & Webb, Jacksonville, Fla., Richard A. Hollander, Richmond, Va., for defendant in intervention Seaboard Air Line Railroad Co.

William H. Maness, of Kurz, Toole, Maness & Martin, Prime F Osborn, John W. Weldon, Phil C. Beverly, Jacksonville, Fla., for defendants in intervention Atlantic Coast Line Railroad Co. and Atlantic Coast Line Co.

William H. Maness, of Kurz, Toole, Maness & Martin, Jacksonville, Fla., Edwin H. Burgess, Baltimore, Md., for defendant in intervention Mercantile-Safe Deposit & Trust Co.

Before RIVES, Circuit Judge, and SIMPSON and McRAE, District Judges.

RIVES, Circuit Judge.

This is an action to enjoin, annul, and set aside orders of the Interstate Commerce Commission [1] which, subject to routing and gateway conditions and employee protective conditions, authorize the merger of the Atlantic Coast Line Railroad Company into Seaboard Air Line Railroad Company and the related acquisition of control by Seaboard of carriers subsidiary to or affiliated with Atlantic Coast Line, most prominently in-

---

1. See 49 U.S.C. § 17(9); 28 U.S.C. § 2321.

cluding Louisville and Nashville Railroad Company. Florida East Coast Railway Company brought the action against the United States and the Interstate Commerce Commission.[2] Since the Attorney General, representing the United States,[3] opposes the merger, the United States has been realigned as a party plaintiff. Jurisdiction of this court is provided by 28 U.S.C. § 1336, and a district court of three judges has been convened as required by 28 U.S.C. § 2325.

Plaintiff Florida East Coast Railway Company, a Florida corporation, has its principal office at Saint Augustine, Saint Johns County, Florida, which is in the Middle District of Florida. Hence venue is properly laid in the Middle District. See 28 U.S.C. § 1398.

The Railway Labor Executives' Association, the Southern Railway Company, and its affiliated companies in the Southern Railway System intervened as parties plaintiff. The Mercantile-Safe Deposit and Trust Company, the Seaboard Air Line Railroad Company, the Atlantic Coast Line Railroad Company and The Atlantic Coast Line Company intervened as parties defendant in support of the challenged orders of the Commission.

Florida East Coast's motion for an order restraining temporarily the operation and effective date of the orders of the Interstate Commerce Commission, pending the final hearing and determination of the action, see 28 U.S.C. § 2324, was granted by the Honorable Bryan Simpson, Chief Judge, United States District Court for the Middle District of Florida, based on the specific finding that irreparable damage would result to the plaintiffs if the temporary restraining order was not granted. See 28 U.S.C. §§ 2284(3), 2324. Compare 28 U.S.C. § 2325.

The Commission stated that the merger it approves[4] would result in the elimination of present competition between Seaboard and Atlantic Coast Line in a six-state area.[5] In the six-state area and in an eight-state area,[6] the merged company would control more than 54 per cent of the total railroad mileage, while the Southern Railway Company, its nearest competitor, would have about 34 per cent. The merged company would have approximately 81 per cent of the railway mileage in Florida. See Seaboard Air Line R. R., 320 I.C.C. 122, 163 (1963). Approximately 4,257 jobs would be abolished and the location of employment would be changed for 4,439 other employees, 320 I.C.C. at 154. The Commission found that: the reduction of rail competition caused by the proposed merger will not be substantial; ample competitive rail service will remain after the merger throughout most of the affected area; and the reduction in competition that will result from the merger will have no appreciable injurious effect upon shippers and communities. 320 I.C.C. at 167. The Commission noted that the merger will have substantial adverse effects upon many railroad employees and their families, but, in the long run, the merger would provide greater job security and more stabilized conditions of employment for employees of the merged company. See 320 I.C.C. at 200. Both Seaboard Air Line and Atlantic Coast Line are currently in healthy financial condition.

The questions raised in this three-judge district court action deal with the protective conditions for employees and with the relationship between section 5(2)[7] of the Interstate Commerce Act—which authorizes the Commission to approve proposed mergers that are found

---

2. See 28 U.S.C. §§ 2322, 2323; 49 U.S.C. § 17(9).

3. See 28 U.S.C. § 2323.

4. Commissioner Webb, with whom Commissioner Tucker joined, dissented.

5. The six states are Alabama, Florida, Georgia, North Carolina, South Carolina and Virginia.

6. The additional states are Tennessee and Kentucky.

7. 49 U.S.C. § 5(2).

to be in the "public interest"[8]—and the antitrust laws, more specifically section 7 of the Clayton Act.[9]

Plaintiff Florida East Coast suggests that the ultimate importance of this case is that the Commission has written preservation of competition and prevention of monopoly out of the concept of "public interest."

Section 5(2)(c) of the Interstate Commerce Act, which sets forth certain factors which must be considered by the Commission in passing upon any proposed railroad merger or affiliation, does not expressly require that the Commission consider the antitrust laws as a factor in the public interest. The Commission is required by section 5(2)(c) to

"give weight to the following considerations, *among others:* (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected." [10]

However, the Commission has long been required "to give weight to the antitrust policy of the nation before approving mergers and consolidations."[11] The antitrust laws are expressly considered in section 5(11) of the Act which exempts carriers and individuals participating in an approved merger

"from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State or municipal, insofar as may be necessary to enable them to carry into effect the transactions so approved * * * and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction." [12]

The Commission has been required to accommodate section 5(2) and the antitrust legislation due to the presence of

8. 49 U.S.C. § 5(2)(b); see e. g., Phillips, Railroad Mergers: Competition, Monopoly, and Antitrust, 19 Wash. & Lee L.Rev. 1, 9 (1962).

9. 15 U.S.C. § 18.

10. 49 U.S.C. § 5(2)(c). (Emphasis added.) The Act of Sept. 18, 1940, ch. 722, tit. I § 1, 54 Stat. 899, which amended the Interstate Commerce Act, set forth the "National Transportation Policy":
"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. *All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.*"
49 U.S.C.A. (Historical note following table of contents). (Emphasis supplied.)

11. Georgia v. Pennsylvania R. R. Co., 1945, 324 U.S. 439, 456, 65 S.Ct. 716, 89 L. Ed. 1051.

12. McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 76–77, 64 S.Ct. 370, 375, 88 L.Ed. 544; 49 U.S.C. § 5(11). In cases of affiliation of a motor carrier with a railroad, the Commission cannot approve the merger "unless it finds that the transaction proposed will be consistent with the public interest and will enable such carrier to use service by motor vehicle to public advantage in its operations and will not unduly restrain competition." 49 U.S.C. § 5(2)(b).

the section 5(11) exemption [13] and the history of the development of the national transportation policy.[14]

In giving weight to antitrust policy as a factor in the "public interest," plaintiff Florida East Coast contends that the Commission must define the "line of commerce" (relevant product, or services, market) and "section of the country" (relevant geographical market) in which to appraise the probable competitive effects of the proposed merger and must determine whether the effect of the merger "may be substantially to lessen competition" or "tend to create a monopoly." [15]

On its face this contention may seem contrary to the Supreme Court's decision in McLean Trucking Co. v. United States.[16] McLean involved the Commission's approval of the consolidation of seven large motor carriers. The most important effect of the merger was to create an end-to-end consolidation from points in the far South to New England, with obviously large possibilities for through service.[17] The order approving the consolidation was attacked on the ground that the merger, notwithstanding Commission approval, violated the Sherman Act [18] and, hence, the Commission had no power to approve the merger.

The Court decided that the Commission is not required to decide definitively whether the transaction violates the Sherman Act, but that the Commission's role is to "estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed consolidation and consider them along with the advantages of improved service, safer operation, lower costs, etc., to determine whether the consolidation will assist in effectuating the over-all transportation policy." [19]  However, McLean does not dispose of the plaintiff's contention. Basic to the Court's determination in that case was the holding that the Commission has no jurisdiction to enforce the proscriptions of the Sherman Act. The Court stated:

"To secure the continuous, close and informed supervision which enforcement of legislative mandates frequently requires, Congress has vested expert administrative bodies such as the Interstate Commerce Commission with broad discretion and has charged them with the duty to execute stated and specific statutory policies. That delegation does not necessarily include either the duty or the authority to execute numer-

13. Minneapolis & St. L. Ry. Co. v. United States, 1959, 361 U.S. 173, 186, 80 S.Ct. 229, 4 L.Ed.2d 223.

14. McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 79, 64 S.Ct. 370, 88 L.Ed. 544.

15. Section 7 of the Clayton Act provides in part:
"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.
"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the juris-

diction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.
\* \* \* \* \*
"Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the \* \* \* Interstate Commerce Commission \* \* \*."
15 U.S.C. § 18.

16. 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

17. See id. at 71, 64 S.Ct. 370.

18. See 15 U.S.C. §§ 1–3.

19. Id. at 87, 64 S.Ct. at 381.

ous other laws. Thus, here, *the Commission has no power to enforce the Sherman Act as such. It cannot decide definitively whether the transaction contemplated constitutes a restraint of trade or an attempt to monopolize which is forbidden by that Act.* The Commission's task is to enforce the Interstate Commerce Act and other legislation which deals specifically with transportation facilities and problems. That legislation constitutes the immediate frame of reference within which the Commission operates; and the policies expressed in it must be the basic determinants of its action."

321 U.S. at 79–80, 64 S.Ct. at 376 (Emphasis supplied.) In sharp contrast to the Commission's lack of jurisdiction to enforce the Sherman Act, Congress by section 11 of the Clayton Act has entrusted the Commission with authority to enforce compliance with section 7 and other Clayton Act provisions "where applicable to common carriers" under the Commission's jurisdiction.[20] While "the Commission's task is to enforce the Interstate Commerce Act and other legislation which deals specifically with transportation facilities and problems," the Clayton Act legislation constitutes an additional "frame of reference within which the Commission operates."[21]

We think Minneapolis & St. L. Ry. Co. v. United States,[22] a decision more recent than McLean, recognizes that the Commission's estimate of the scope and appraisal of the effects of any curtailment of competition which might result from a merger is to be initially and properly approached in terms of whether the effect is "substantially to lessen competition, or to tend to create a monopoly." In Minneapolis the Commission found that

a proposed railroad acquisition "would not result in any significant [much less substantial] lessening of competition."[23] Its determination was said to rest upon "adequate findings."[24]

There is an additional reason why the Commission is required to decide whether or not section 7 of the Clayton Act would be violated by the proposed merger. It would seem that the Commission is required to "give weight" to antitrust policy in a section 5(2) proceeding only if the merger has the probable anticompetitive effect proscribed by section 7 of the Clayton Act. More specifically, when the effect of a proposed merger "may be substantially to lessen competition" or "to tend to create a monopoly," "in any line of commerce in any section of the country," the prohibition of the Clayton Act must be given weight. Conversely, when the proposed merger would not so result, the Commission is not required to give weight to antitrust policy. The Commission impliedly recognizes such a principle in its finding in the present case that the reduction of rail competition caused by the proposed merger will not be substantial. 320 I.C.C. 167.

▮ Furthermore, it has long been settled that "immunity from the antitrust laws is not lightly implied."[25] When an agency, such as the Interstate Commerce Commission, is entrusted by Congress with authority to require compliance with section 7 of the Clayton Act,[26] and also to grant relief from the operation of the antitrust laws,[27] the logical corollary would be that the Commission will not grant immunity from the antitrust laws unless clearly authorized by the law and required by the evidence.

▮ For that policy to have any real substance the Commission is required to

---

20. 15 U.S.C. § 21. See Georgia v. Pennsylvania R. R. Co., 1945, 324 U.S. 439, 456 and n. 9, 65 S.Ct. 716, 89 L.Ed. 1051.

21. See McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 79–80, 64 S.Ct. 370, 377, 88 L.Ed. 544.

22. 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959).

23. Id. at 188, 189, 80 S.Ct. 239.

24. Id. at 189, 80 S.Ct. 229.

25. See, e. g., United States v. Philadelphia Nat'l Bank, 1963, 374 U.S. 321, 348, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915.

26. 15 U.S.C. § 21.

27. 49 U.S.C. § 5(11).

determine whether or not the effect of the proposed merger "may be substantially to lessen competition" or "to tend to create a monopoly," "in any line of commerce in any section of the country." That does not mean that the Commission may authorize only those acquisitions which would not offend section 7 of the Clayton Act.[28] The Commission with propriety may approve a rail consolidation, otherwise prohibited by the antitrust laws, in order to bring about needed or desirable improvement in service and economies in operation.[29] In other words, if the Commission finds that the policy of the Transportation Act would be thwarted unless a particular type of merger or consolidation were permitted, it would be authorized to approve the merger or consolidation, although the transaction would otherwise violate section 7 of the Clayton Act.[30]

■ Concomitant to the Commission's determination of whether the effect of the merger "may be substantially to lessen competition" or "tend to create a monopoly," the Commission must define the area of effective competition by reference to a product, or service market (the "line of commerce") and a geographic market (the "section of the country").[31]

We note that in Minneapolis & St. L. Ry. Co., supra, which considered both the Sherman Act and section 7 of the Clayton Act, the Supreme Court did not expressly direct the Commission to define the relevant market by delineating a service market and a geographical market. However, that case was decided prior to Brown Shoe Co. v. United States, 1962, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed. 2d 510. Brown Shoe was the first case to consider the background of the 1950 amendments to section 7 of the Clayton Act. In Brown Shoe, the Supreme Court set forth directions for measuring the relevant market within which the anticompetitive effects of a merger are to be judged.[32]

There is an additional reason for requiring the Commission to determine the product market and the geographic locus of competition. The Commission imposed routing and gateway conditions for the benefit of the intervening railroads to offset possible diversion of traffic by the merged company. It noted that "absent suitable protective conditions and consideration of these factors [the public advantage that will accrue from the merger], there is a distinct possibility that the proposed transaction would tend to lessen competition to an extent which would contravene the policy underlying the antitrust laws."[33] We think it clear, as the Commission has recognized, that routing and gateway conditions bear a distinct relationship to the possible anticompetitive effects of the merger. Moreover, we do not think routing and gate-

28. See Minneapolis & St. L. Ry. Co. v. United States, 1959, 361 U.S. 173, 187, 80 S.Ct. 229, 4 L.Ed.2d 223.

29. See McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 78, 64 S.Ct. 370, 88 L.Ed. 544.

30. See id. at 94, 64 S.Ct. 370 (dissenting opinion).

31. See Brown Shoe Co. v. United States, 1962, 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510.

32. Although Minneapolis & St. L. Ry. was decided in 1959, it is clear that only section 7 of the Clayton Act as enacted in 1914 was involved in that case and dealt with by the Court. See 361 U.S. at 185 & n. 11, 80 S.Ct. 229. The Court stated that "section 5(11) is both a more recent and a more specific ex-

pression of congressional policy than § 1 of the Sherman Act and § 7 of the Clayton Act * * *." 361 U.S. at 186, 80 S.Ct. at 237. However, the 1950 amendment to the section 7 of the Clayton Act is later in time than either section 5(11) or section 5(2) of the Interstate Commerce Act. Compare 15 U.S.C.A. § 18 (Historical note), with 49 U.S.C.A. § 5(2) (Historical note) and 49 U.S. C.A. § 5(11) (Historical note).

33. 320 I.C.C. at 167. Compare 320 I.C.C. at 188. "We are convinced that these routing and gateway conditions will establish two balanced competitive systems in that area and will result in an increase rather than decrease in intramodal rail competition than will contribute to the present and future economic development of this important section of the Nation."

way conditions can be meaningful in terms of the "public interest" as affected by the Clayton Act unless they are imposed by reference to the product market and the geographic market. The Commission's primary concern is the "public interest," not "private interest." To impose routing and gateway conditions outside the context of the relevant markets either fails to employ Clayton Act standards as relevant to the public interest or assumes that private interest is consistently compatible with the public interest.

█ Therefore, we hold that the Commission must define the "line of commerce" and "section of the country" in which to appraise the probable competitive effects of the proposed merger and must determine whether the effect of the merger "may be substantially to lessen competition" or "tend to create a monopoly." The reason the Commission must make such findings is, most precisely, the fact that antitrust policy, to be given any effect whatsoever, must be measured in terms of criteria that have been developed by Congress and the courts.[34] If an erroneous statutory construction lies hidden in vague or insufficient findings then important statutory prerequisites to merger may be overlooked.[35]

█ Applying that holding to the present case, we conclude that the Commission has failed to make sufficient findings to accommodate section 5(2) of the Interstate Commerce Act with section 7 of the Clayton Act.

The Commission's conclusion concerning the anticompetitive effects of the proposed merger is reflected in its following statement:

"Except in portions of Florida, the over-all reduction in rail competition in the Southeastern States will be relatively moderate and inconsequential when viewed in the light of the alternative rail service that will be provided by competitors of the merged company at most of the major industrial centers in the affected area. With few exceptions, vigorous rail competition will continue to flourish in the territory served by the merged company. The impact of any lessening of rail competition that might result from this merger will be minimized by the increasingly strong competition that the merged company will encounter from other modes of transportation."

320 I.C.C. at 211, 212. The Commission noted that Tampa and the central and western portions of Florida are served by no other railroads except Seaboard and Atlantic Coast Line. It recognized that the merger would supplant the duopoly with a rail monopoly. 320 I.C.C. at 164–65. The Commission's conclusion that the reduction of rail competition caused by the proposed merger would not be substantial, 320 I.C.C. at 167, was determined by reference to rail competition in the Southeastern States as a whole.[36] Furthermore, the Commission

---

34. In a recent article Professor Handler and Mr. Robinson have noted that "whatever the guidelines for ascertaining whether a merger may have the proscribed anticompetitive effects, they are not in the legislative text and must inevitably be defined by the highest court." Handler & Robinson, The Supreme Court v. Corporate Mergers, Fortune, January, 1965.

35. See United States v. Carolina Freight Carriers Corp., 1942, 315 U.S. 475, 489, 62 S.Ct. 722, 86 L.Ed. 971.

36. The Supreme Court has noted that "if anticompetitive effects of a merger are

probable in 'any' significant market, the merger—at least to that extent—is proscribed [by section 7]. To illustrate: If two retailers, one operating primarily in the eastern half of the Nation, and the other operating largely in the West, competed in but two mid-Western cities, the fact that the latter outlets represented but a small share of each company's business would not immunize the merger [under section 7] in those markets in which competition might be adversely affected. On the other hand, that fact would, of course, be properly considered in determining the equitable relief to be decreed." Brown Shoe Co. v.

noted the growth in motor and water transportation service in recent years in Tampa and the surrounding area. See 320 I.C.C. at 152–53. And its conclusion that the reduction in competition that will result from the merger will have no appreciable injurious effect upon shippers and communities, 320 I.C.C. at 167, was apparently by reference to other modes of transportation—motor carriers, air carriers, water carriers and pipelines —operating in the Southeastern States.

■■ It may be that the relevant geographical market is the Southeastern States as a whole. But the proper question to be asked in determining the appropriate "section of the country" "is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." [37] The geographic market selected must both correspond to the commercial realities of the industry and be economically significant. Although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area.[38]

■■ It may be that the relevant service market includes modes of transportation other than railroads. But the fact that other modes of transportation operate within the geographic area or areas, within which the anticompetitive effects of a merger are to be judged, is not determinative of the relevant service market. Similarly, reference to tonnage and dollar aggregates to show the decline of railroad transportation and rise of other modes of transportation, and such statistics as the number of truck registrations in an area, are not, in themselves, determinative.' The outer boundaries of a service market are to be determined by the reasonable interchangeability of use or the cross-elasticity of demand between the service itself and substitutes for it. It should be noted, however, that within this broad market, well-defined submarkets may exist, which in themselves constitute service markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the service's peculiar characteristics and uses, unique service facilities, distinct customers, distinct prices and sensitivity to price changes.[39]

■■ The United States, acting through the Attorney General, requests that the merger of Seaboard Air Line and Atlantic Coast Line be *permanently* enjoined. While a three-judge district court has power to enjoin the *orders* of the Commission authorizing a merger, we doubt if such a court has the power to permanently enjoin the *merger*. See 28 U.S.C. § 2321. Furthermore, the three-judge district court is limited to determining whether the Commission made any errors of law, whether its action was arbitrary, capricious, or an abuse of its discretion, and, upon review of the whole record, whether its findings of fact are supported by substantial evidence.[40] The United States' request that this Court permanently enjoin the merger would require that the Court go beyond

United States, 1962, 370 U.S. 294, 337 & n. 65, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510.

37. United States v. Philadelphia Nat'l Bank, 1963, 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915.

38. See Brown Shoe Co. v. United States, 1962, 370 U.S. 294, 336–37, 82 S.Ct. 1502, 8 L.Ed.2d 510.

39. See id. at 325, 82 S.Ct. 1502. Thus it may be that railroads constitute at least a submarket for the transportation of heavy-loading, low value bulk commodities due to cost and service advantages available to railroads.

Just as a service submarket may have section 7 significance as the proper "line of commerce," so may a geographic submarket be considered the appropriate "section of the country." See id. at 336, 82 S.Ct. 1502.

40. See Brotherhood of Maintenance of Way Employees v. United States, D.C., 221 F.Supp. 19, 24, aff'd mem., 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270 (1963).

the present record. We would have to find that upon no set of facts which the applicants might present could the merger be found to be in the "public interest." For this Court to enjoin permanently the merger would require that we invade the long-established province of the Commission. Resolving such considerations is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. The wisdom and experience of the Commission, not of the courts, must determine whether the proposed consolidation is "consistent with the public interest." [41] The United States' request for a permanent injunction against the merger is accordingly denied.

■ Intervening-plaintiff Railway Labor Executives' Association contends that the terms and conditions imposed by the Commission to protect the interests of the railroad employees affected are inadequate and violate section 5(2) (c) (4)[42] and section 5(2) (f)[43] of the Interstate Commerce Act and are unsupported by adequate, clear, and precise findings. The Association requests that the orders of the Commission should be declared invalid on these grounds. The Association's request, as its brief recognizes, is based on the assumption that the Commission's orders authorizing the merger are otherwise approved. Since the Commission's orders must be enjoined for the reasons discussed above, consideration of the Association's contentions would be premature at this time.

■ The Commission found that under the merger plan the Mercantile-Safe Deposit and Trust Company will acquire power to control the merged company. It would be premature at this time for this Court to pass upon the question of whether Mercantile's power of control would be consistent with the public interest without requiring it to be considered as a carrier under section 5(3)[44] of the Interstate Commerce Act.

The orders of the Interstate Commerce Commission served December 13, 1963 and March 6, 1964 authorizing a merger of the properties and franchises of Atlantic Coast Line Railroad Company into Seaboard Air Line Railroad Company will be annulled and set aside and the enforcement of said orders enjoined, all without prejudice to further proceedings before and further findings and orders by the Commission not inconsistent with this opinion.

41. McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 87–88, 64 S.Ct. 370, 88 L.Ed. 544.

42. "In passing upon any proposed transaction under the provisions of this paragraph, the Commission shall give weight to the following considerations, among others: * * * (4) the interest of the carrier employees affected." 49 U.S.C. § 5(2) (c) (4).

43. "As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees." 49 U.S.C. § 5(2) (f).

44. 49 U.S.C. § 5(3).