**FLORIDA EAST COAST RAILWAY COMPANY, a corporation, et al., Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, et al., Defendants.**

No. 64–64–Civ. J.

United States District Court
M. D. Florida,
Jacksonville Division.

June 8, 1966.

Robert W. Ginnane, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., Edward F. Boardman, U. S. Atty., Jacksonville, Fla., Lionel Kestenbaum, Antitrust Division, Dept. of Justice, Washington, D. C., for defendants.

Prime F. Osborn, Phil C. Beverly, Jacksonville, Fla., Dennis G. Lyons, Arnold & Porter, Washington, D. C., William H. Maness, Jacksonville, Fla., Richard A. Hollander, Richmond, Va., John S. Cox, Jacksonville, Fla., Walter H. Brown, Jr., New York City, for Atlantic Coast Line R. Co. and Seaboard Air Line R. Co.

Edwin H. Burgess, Baltimore, Md., for Mercantile-Safe Deposit and Trust Co.

Fred H. Kent, Jacksonville, Fla., A. Alvis Layne, Washington, D. C., for Florida East Coast R. Co.

Wm. Graham Claytor, William D. McLean, John K. Mallory, Jr., Washington, D. C., H. P. Osborne, Jr., Jacksonville, Fla., for Southern Railway System.

William G. Mahoney, Washington, D. C., William H. Adams, III, Jacksonville, Fla., for Railway Labor Executives' Assn.

William Reece Smith, Jr., City Atty., Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for City of Tampa.

MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for petitioner Port Sutton Inc.

Before RIVES, Circuit Judge, and SIMPSON and McRAE, District Judges.

RIVES, Circuit Judge:

Our first opinion [1] in this case was vacated and remanded by the Supreme Court and we have now considered the Interstate Commerce Commission's action anew. The Interstate Commerce Commission,[2] by an order entered in December 1963, authorized the merger of the Atlantic Coast Line Railroad Company [3] with the Seaboard Air Line Railroad Company,[4] subject to certain routing and gateway conditions and employee protective conditions. Related acquisition of control by Seaboard of carriers subsidiary to or affiliated with Atlantic, most prominently including the Louisville and Nashville Railroad Company, was also authorized. 320 I.C.C. 122 (1963). Florida East Coast Railway Company [5] brought suit in this Court asking that the ICC's order be enjoined, annulled and set aside.

A three-judge district court was convened pursuant to 28 U.S.C.A. § 2325. The Attorney General, representing the United States, opposed the merger and therefore the United States was realigned as a party-plaintiff. The Railway Labor Executives' Association, the Southern Railway Company,[6] and its affiliated companies in the Southern Railway System intervened as parties-plaintiff. At the hearing on remand the City of Tampa also intervened as a party-plaintiff. In addition to defendant ICC, the Mercantile-Safe Deposit and Trust Company, the Seaboard and the Atlantic, all intervened as parties-defendant. In this posture issue was joined.

After submission of briefs and full argument, in our first opinion we set.

1. Florida East Coast Ry. Co. v. United States, D.C., 242 F.Supp. 14, rev., Seaboard Air Line R. Co. v. United States, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965).

2. Hereafter Commission or ICC.

3. Hereafter Atlantic or ACL.

4. Hereafter Seaboard or SAL.

5. Hereafter FEC.

6. Hereafter Southern.

aside the ICC's order and remanded the case to the Commission for further proceedings. Our reasoning was two-fold. First, we determined that the ICC's analysis of the merger was defective because it failed to apply proper product and geographic market criteria as explicated in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Second, we held that the Commission erred in not specifically determining whether the merger violated section 7 of the Clayton Act, 15 U.S.C.A. § 18 (1964 ed.). The Supreme Court vacated our judgment and remanded "for a full review of the administrative order and findings pursuant to the standards" they had previously "enunciated." 382 U.S. 154, 86 S.Ct. 277 (1965).[7]

■ This case presents a head-on-collision between the antitrust laws and the Interstate Commerce Act. It is incumbent upon us to seek to rationalize the statutes involved here and make of them, to the extent that what Congress has written will permit, a harmonious functional body of law. Section 5(2) directs the Commission to approve voluntary rail mergers which it finds to be "consistent with the public interest," but reserves to the Commission power to approve the merger subject to such "terms and conditions" as it may find to be "just and reasonable." Section 5(2) (c) of the Interstate Commerce Act, which sets forth certain factors which must be considered by the ICC in passing upon any proposed railroad merger or affiliation, does not expressly require that the Commission consider the antitrust laws as a factor in the public interest. However, since section 5(11) exempts carriers and individuals participating in an approved merger from the antitrust laws, the ICC has long been required to give weight to the antitrust policy of the Nation in approving mergers.[8] It is the accom-

7. In explaining the proper scope of review, the Supreme Court said:

"We believe that the District Court erred in its interpretation of the directions this Court set forth in McLean Trucking Co. v. United States, 321 U.S. 67 [64 S.Ct. 370, 88 L.Ed. 544] (1945), and Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173 [80 S.Ct. 229, 4 L.Ed.2d 223] (1959). As we said in Minneapolis at 186 [80 S.Ct. at 237]:

" 'Although § 5(11), does not authorize the Commission to "ignore" the antitrust laws, McLean Trucking Co. v. United States, 321 U.S. 67, 80 [64 S. Ct. 370, 88 L.Ed. 544], there can be "little doubt that the Commission is not to measure proposals for [acquisitions] by the standards of the antitrust laws." 321 U.S., at 85–86 [64 S.Ct. at 379]. The problem is one of accommodation of § 5(2) and the antitrust legislation. The Commission remains obligated to "estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed [acquisition] and consider them along with the advantages of improved service [and other matters in the public interest] to determine whether the [acquisition] will assist in effectuating the over-all transportation policy." 321 U.S. at 87 [64 S.Ct. at 381].' " (382 U.S. at 156, 86 S.Ct. at 278.)

8. Georgia v. Pennsylvania R. Co., 324 U.S. 439, at 456, 65 S.Ct. 716, 89 L.Ed. 1051 (1945) ; McLean Trucking Co. v. United States, 321 U.S. 67 at 79–80, 87, 64 S.Ct. 370 (1944). The Commission in the instant case clearly recognized this duty when it said (320 I.C.C. at 128–29, 206) :

"However, we may not disregard the policy underlying the antitrust laws even though carriers participating in a merger are relieved by section 5(11) from the operation of such laws. Minneapolis & St. Louis R. Co. v. United States, supra [361 U.S. 173, 80 S.Ct. 229]. Our primary task is to reconcile the objective of 'preventing injurious waste and in securing more efficient transportation service,' New York Central Securities Corp. v. United States, supra, [287 U.S. 12], at 26, [53 S.Ct. 45, 77 L.Ed. 138], with the general concern of Congress 'that tendencies toward concentration in industry are to be curbed in their incipiency, particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a time.' Brown Shoe Co. v. United States, 370 U.S. 294, 346, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In short, our 'problem is one of accommodation of section 5(2) and the antitrust legislation.' Minneapolis & St. Louis R. Co.

modation of the national transportation policy with the national antitrust policy with which this litigation is chiefly concerned.

The records and briefs in this case read far more like an antitrust case or FTC review proceeding than like an action to set aside an order of the ICC. This aspect can only be indicative of one fact—at some point the orderly administrative process envisioned by Congress has been derailed. All too much time has been consumed in showing a violation of the antitrust laws and too little time devoted to assessing the "public interest" as expressed in the Interstate Commerce Act. Review of ICC proceedings, while in many respects quite similar in appearance to FTC review, is substantially different.

■ It is not without significance that Congress placed review of proceedings of the FTC in the Courts of Appeals and those of the ICC in a three-judge district court. Each has three judges, but there the comparison ends. The FTC is to administer a group of statutes whose meaning and content are primarily entrusted to the judiciary for rational extrapolation. There was no intention on the part of Congress that the FTC should become a plenary body, reshaping American industry to a model which the Commission in its own wisdom decided best served the Nation. On the contrary, the FTC was to prevent "unfair competition" in widely divergent industries, preserving the existing price system so fundamental to the American way of life.

Review of such proceedings could easily be fitted into the normal appellate process. A one-hour argument coupled with briefs sufficient to phrase out the issues with which courts of appeals routinely deal, allow a circuit court to give a carefully studied review.

■ The ICC stands in a uniquely different posture. Congress has vested the Commission with "exclusive and plenary" powers in the regulation of rail mergers. No one who reviews the history and language of the Interstate Commerce Acts can doubt that Congress has entrusted the ICC with plenary power to regulate almost every aspect of the rail industry and, for that matter, almost every aspect of the transportation industry save the airlines.[9] The ICC is in many ways a super-management, often making managerial-type decisions affecting the transportation industry, with but one overriding duty—to protect the public interest.[10] A rail carrier cannot change rates without ICC approval, and the ICC can on its own initiative investigate and alter rates after proper findings.[11]

v. United States, supra, [361 U.S.] at 186, 80 S.Ct. at 237

\* \* \* \* \*

"Although section 5 transactions are immunized from the operation of the antitrust laws, the policy reflected by such laws is nevertheless an important element in determining public interest. As we have stated, we are confronted here with the task of accommodating section 5 and the antitrust laws, and in so doing, we must reconcile the numerous conflicting considerations that are inevitably involved."

**9.** 49 U.S.C.A. § 1 et seq.

**10.** In United States v. Pierce Auto Lines, 327 U.S. 515 at 536, 66 S.Ct. 687, at 698, 90 L.Ed. 821 (1946), the Supreme Court said: "We think the court [below] misconceived \* \* \* its own function. It is not true, as the opinion stated, that

'\* \* \* the courts must in a litigated case, be the arbiters of the paramount public interest.' This is rather the business of the Commission, made such by the very terms of the statute. The function of the reviewing court is much more restricted." See United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243 (1940). This was the role in which the ICC saw itself cast in the instant case (320 I.C.C. at 206): "In fact, as guardian of the public interest, it is our responsibility to determine whether the proposed merger will, as required by the national transportation policy, contribute to the development and maintenance of a public transportation system which will meet the needs of our Nation's commerce and or national defense."

**11.** 49 U.S.C.A. § 15.

New services cannot be provided nor old ones discontinued without Commission approval.[12] No new railroad may enter the field without ICC permission; the Commission may compel an existing railroad to extend its line and provide new service.[13] We have, in effect, a government-protected monopoly for those already providing service. In the area of rail mergers and consolidations, Congress' intention to let the ICC plan the structure of the national transportation industry has long been apparent.[14] World War I with the government takeover of the rail system had left this Nation's primary transportation system in a state of dilapidation. War needs had diverted critical materials to other areas of the economy and needed rail repairs had been neglected.

Congress, therefore, determined that the health and vitality of the Nation's railroads could best be restored by merging them into fewer, more efficient systems than then existed. Congress realized that it was functionally not the appropriate body to study and determine which railroads should be combined. It had neither the time nor the facilities. The Transportation Act of 1920 thus for the first time conferred upon the ICC "exclusive and plenary" power over rail mergers. The Commission was directed to "prepare and adopt a [master] plan for the consolidation of the railway prop-

erties of the continental United States into a limited number of systems".[15] However, the Commission was not given power to force consolidation. It had to come voluntarily. Only mergers which were in harmony with the master plan could be approved. Approved mergers were exempt from the antitrust laws.

It was apparent almost from the outset that the master plan approach had set an impossible pattern. The Transportation Act of 1940 took a more realistic view.[16] It abandoned the idea of a master plan, as such, and adopted a more flexible approach which authorized the ICC to approve carrier-initiated voluntary plans for mergers if those plans conformed to a public interest test prescribed by the Act. A requirement relating to the preservation of competition contained in the 1920 Act was deleted by the 1940 Act. The initiative to formulate plans for consolidation or merger thus passed from the Commission to the rail carriers; but exclusive and plenary power to grant permission for such mergers subject to such conditions as might be prescribed was left with the ICC.[17]

Unlike review of FTC proceedings, review of ICC approved mergers involves the review of intricate, expert plenary judgments in a highly specialized area of our economy that has long been subject to direct precise regulation.[18] The ICC

---

12. 49 U.S.C.A. §§ 1, 13a.

13. 49 U.S.C.A. § 1.

14. For a brief background note on the present section 5, see appendix to Justice Frankfurter's opinion in St. Joe Paper Co. v. Atlantic Coast Line Co., 347 U.S. 298, at 315, 74 S.Ct. 574, at 584, 98 L.Ed. 710 (1954).

15. 41 Stat. 481.

16. 54 Stat. 905.

17. While there were many who desired to give the Commission power to compel mergers, Congress declined the invitation to confer that power. St. Joe Paper Co. v. Atlantic Coast Line Co., 347 U.S. 298, 74 S.Ct. 574 (1954); Brotherhood of Maintenance of Way Employees v. United States, 221 F.Supp. 19 (E.D.Mich.

1963), aff'd, 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270.

18. In Ayrshire Corp. v. United States, 335 U.S. 573 at 592–593, 69 S.Ct. 278, at 288, 93 L.Ed. 243 (1949), the Supreme Court stated:
"Rate structures are not designed merely to favor the revenues of producers and carriers. The Commission has the consumer interest to safeguard as well. And when it undertakes to rationalize the interests of the three, great complexities are often encountered. The economics of the bituminous coal industry have baffled even experts. We would depart from our competence and our limited function in this field if we undertook to accommodate the factors of transportation conditions, distance and competition differently than the

was authorized to make *ad hoc* determinations within the interstices of individualized records. It is appropriate that initial review should be in a district court, where each case may be set for hearing individually with as much time as necessary allotted. This case is a good illustration. Our last hearings took a full day, and could not have been compressed into the short time usually provided for appellate arguments.

▮ This Court must not shirk its duty by providing only a perfunctory review. But we are equally bound to keep our review within the limits intended by the statutory scheme of this particular agency.[19] We would be no friend

of the administrative process if we were to leave the Commission at large, free to roam from one arbitrary or capricious act to another. If judicial review is to have a basis for functioning, the ICC must do more than announce its ultimate conclusions by way of unrationalized fiat.[20] The Commission must explain its reasoning in clear and precise terms. It must support its application of that reasoning to the instant case by substantial evidence in the record on which we must base our review.[21] It is for us to determine whether the ICC has correctly applied the proper standards, and thus exhibited that familiarity with the problems in the transportation industry which Congress anticipated the ICC

Commission has done in this case. That is a task peculiarly for it. In fashioning what the Commission called a differentially related and finely balanced rate structure for this coal, there is no place for dogma or rigid formulae. The problem calls for an expert, informed judgment on a multitude of facts. The result is that the administrative rate-maker is left with broad discretion as long as no statutory requirement is overlooked. Yet that is, of course, precisely the nature of the administrative process in this field. See Board of Trade v. United States, 314 U.S. 534, 548 [62 S.Ct. 366, 372, 373, 86 L.Ed. 432]; [State of] New York v. United States, 331 U.S. 284, 347–349 [67 S.Ct. 1207, 1240, 1241, 91 L.Ed. 1492]."

See ICC v. Parker Motor Freight, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945); American Trucking Association v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1952); Hudson & Manhattan R. Co. v. United States, 313 U.S. 98, 61 S.Ct. 884, 85 L.Ed. 1212 (1941); Carolina Scenic Stages v. United States, 202 F.Supp. 919 (W.D.S.C.1962); Penn. R. Co.–Merger–N. Y. Central Ry. Co., 327 I.C.C. 475 (1966), at 505. In East Texas Motor Freight Lines Inc. v. Frozen Food Express, 351 U.S. 49 at 54, 76 S.Ct. 574, at 577, 100 L.Ed. 917 (1956), the Supreme Court said: "The Commission is the expert in the field of transportation. And its judgment is entitled to great deference because of its familiarity with the conditions in the industry which it regulates."

19. See, for example, comment in dissenting opinion of Justice Frankfurter, Stark v. Wickard, 321 U.S. 288 at 311, 64 S.Ct. 559, 88 L.Ed. 733 (1944).

20. Florida v. United States, 282 U.S. 194, at 208, 211–212, 215, 51 S.Ct. 119, 75 L.Ed. 291 (1930); S. E. C. v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); Cf. Brook v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 57 S.Ct. 804, 81 L.Ed. 1186 (1937); Morehouse v. United States, 194 F.Supp. 940 (D.Neb.1961), aff'd, 368 U.S. 348, 82 S.Ct. 385, 7 L.Ed.2d 342; Ayrshire Corp. v. United States, 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243 (1949); Brotherhood of Maintenance of Way Employees v. United States, 221 F.Supp. 19 (E.D. Mich.1963), aff'd, 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270; Ace Lines, Inc. v. United States, 197 F.Supp. 591 (S.D. Iowa 1960); Southern Railway Co. v. United States, 167 F.Supp. 747 at 753, (M.D.Ga.1958).

21. See United States v. Pierce Auto Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946); Boston & M. R.R. v. United States, 208 F.Supp. 661 (D.Mass.1962), aff'd, 371 U.S. 26, 83 S.Ct. 117, 9 L.Ed.2d 95; Brotherhood of Maintenance of Way Employees v. United States, 221 F.Supp. 19 (E.D.Mich.1963), aff'd, 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed. 2d 270; Atchison T. & S. F. Ry. v. United States, 244 F.Supp. 955 (N.D.Ill. 1965), appeal pending. Cf. Gray v. Macy, 239 F.Supp. 658 (D.Or.1965).

would achieve from its particularized experience.[22]

The plaintiffs, and particularly the United States through the Antitrust Division of the Justice Department, vigorously attack the standards applied by the ICC in this case. They argue that the ICC failed to properly assess the dangers of this merger, because it failed to apply or misapplied the teachings of modern sophisticated antitrust principles. To understand how national antitrust policy comes into play, it is well at this point for us to review the relationship of section 5(2) (c) and section 5 (11) of the Interstate Commerce Act. In approving a rail merger or consolidation the ICC is required by section 5(2) (c) to

"give weight to the following considerations, *among others*: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected." (Emphasis added.)

Any reference to antitrust policy must be read into the words "among others" by implication, since section 5(11) exempts participants in an approved merger

"from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transactions so approved * * * and to hold, maintain, and operate any properties and exercise any

control or franchises acquired through such transaction."

■ There is and could be no dispute that, in determining whether a given merger is in the public interest, the Commission should take into account the national antitrust policy of the United States.[23] Mr. Justice Black, speaking for the Court in Northern Pacific Railway Co. v. United States, 356 U.S. 1 at 4, 78 S.Ct. 514, at 517, 2 L.Ed.2d 545 (1958), clearly stated the essence of antitrust policy as follows:

"The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions."

The Congress in 1940 enacted the following "National Transportation Policy":

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services,

22. See Ayrshire Corp. v. United States, 335 U.S. 573, at 592–593, 69 S.Ct. 278 (1949); American Trucking Association v. United States, 344 U.S. 298 at 313–314, 73 S.Ct. 307, 97 L.Ed. 337 (1953); see also, United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243 (1940); Hudson & M. R. Co. v. United States, 313 U.S. 98, 61 S.

Ct. 884, 85 L.Ed. 1212 (1941); Chicago S.S. & S.B. R.R. v. United States, 221 F. Supp. 106 (N.D.Ind.1963); Stark v. Wickard, 321 U.S. 288 at 309–310, 64 S. Ct. 559, 88 L.Ed. 733 (1944); Nashua Motor Express, Inc. v. United States, 230 F.Supp. 646 (D.N.H.1964).

23. See n. 8, supra.

without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. *All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.*" (49 U.S.C.A. Historical note following table of contents.) (Emphasis added.)

The main thrust of plaintiffs' argument is that this merger eliminates substantial competition between Seaboard and Atlantic, and in some areas even creates an effective monopoly over the transportation of certain products. This it is argued violates not only the antitrust policy but also the transportation policy of the United States since it fails to "preserve the inherent advantages of each" mode of transportation. Proof of these allegations is sought in a resort to modern sophisticated antitrust principles.

On remand the plaintiffs deny any intention to force the ICC to decide whether a violation of section 7 of the Clayton Act or of the Sherman Act has taken place. But at the same time they argue that the Commission must apply modern sophisticated antitrust market analysis and point to cases like Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) and the concepts of market definition there expressed as examples of how the ICC should have analyzed this merger.[24] It seems pointless to say that the Commission must employ market definition tools calculated to show whether an antitrust violation has taken place, and when it reaches the point where a conclusion may be properly drawn, it may then stop since it need not draw any conclusions. But this illogical mode of behavior would be the result of following both the plaintiffs' rationale and the Supreme Court's recent opinion in this case.

**24.** The Commission has recently rejected the plaintiffs' demand that it slavishly adhere to the *Brown Shoe* market analysis, Penn. R. Co.-Merger-N. Y. Central Ry. Co., 327 I.C.C. 475 (1966), at 509. In Great Northern Pacific & Burlington Lines, Inc.-Merger-Great Northern Railway Co., —— I.C.C. (1966), (F.D. No. 21478) ms. pp. 65–66, the Commission, explained: "Since the *McLean* case [321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544] requires an appraisal of adverse competitive effects following the merger, Justice and other opponents of the merger assert that it is appropriate, if not necessary, to determine the areas of effective competition through an analysis of the relevant geographic and product markets, as those terms are used in antitrust cases. Cf. Brown Shoe Co. v. United States, 370 U.S. 294 [82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The Supreme Court in Seaboard Air Line R. Co. v. United States, 382 U.S. 154, [86 S.Ct. 277, 15 L.Ed.2d 223] in reversing Florida East Coast Ry. Co. v. United States, 242 F.Supp. 14 (M.D.Fla.1965), clearly held that the Commission need not determine whether the proposed merger, absent Commission approval, would violate Section 7 of the Clayton Act, and that in appraising the competitive effects of a proposed rail merger the Commission need not apply yardsticks developed for the purposes of the antitrust laws. The market criteria of *Brown Shoe* can be applied here, if at all, only with great caution and substantial qualification." Later in the report it said (ms. p. 91): "In making the necessary accommodation, the Commission is not required to employ market analysis techniques such as those described in Brown Shoe Co. v. United States, 370 U.S. 294 [82 S.Ct. 1502, 8 L.Ed.2d 510] (1962); nor is the Commission required to determine whether, but for the presence of section 5(11), the proposed merger would violate the antitrust laws of the United States. These questions were recently settled in Seaboard Airline R. Co. v. United States, 382 U.S. 154 [86 S.Ct. 277, 15 L.Ed.2d 223] (1965), affirming the McLean case and extending its rationale to mergers alleged to be inconsistent with the policy of section 7 of the Clayton Act."

Much confusion would have been eliminated in this case had everyone agreed that market analysis has but one function—to help pinpoint the danger areas. This tool is not a qualitative tool. It tells where one may expect a monopoly or a substantial lessening of competition in a given line of commerce carried on in a given geographical area. It does not tell whether this is good or bad. For purposes of the antitrust policy, Congress through its statutes has told us at what point restraints and monopolies are bad. For the purpose of the national transportation policy, Congress has told us that not all restraints and monopolies which violate the antitrust laws are bad.[25] The ICC in its wisdom, and not this Court, is to determine which are to be allowed and which are to be considered bad. Our task is at an end when we satisfy ourselves that the Commission has made adequate findings supported by substantial evidence, that it has perceived the danger areas, and judging by the statutory standards has concluded that the public interest is best served by allowing the merger.[26]

25. Compare the statement of the Commission in Penn. R. Co-Merger-N.Y. Central Ry. Co., 327 I.C.C. 475 (1966), at 505:

"The major goals of the antitrust laws are to preserve the independent competitive status of individual firms and to curb the undue concentration of the American economy without any special regard for the effects of this policy in a particular industry. Cf. Brown Shoe Co. v. United States, 370 U.S. 294, 316–323 [82 S.Ct. 1502, 8 L.Ed.2d 510] (1962) ; United States v. ALCOA, 377 U.S. 271, 279–280, [84 S.Ct. 1283, 12 L.Ed.2d 314] (1964). By contrast, in the transportation industry which is subject to extensive economic regulation, the worth of competition and not merely its preservation must be considered within the regulatory scheme enacted by Congress. The very fact that Congress has seen fit to enter into the comprehensive regulation of transportation contradicts the notion that competition is favored without qualification. Federal legislation affecting railroads is one of many areas of economic activity in which serious inroads have been made on an original policy favoring competition. F.C.C. v. RCA Communications, Inc., 346 U.S. 86, 92–93 [73 S.Ct. 998, 97 L.Ed. 1470] (1952). It is only in a blunt, undiscriminating sense that we can speak of competition as an ultimate good. Ibid, 92 [73 S.Ct. 998]."

The history of the relationship between the Central Pacific Railway Co. (hereafter C.P.R.) and the Southern Pacific [Railroad] Company (hereafter S.P.) is a case in point. In 1914 the United States instituted suit to enjoin the S.P. from controlling the C.P.R., because it violated the antitrust laws. In 1917 the district court dismissed the suit. On direct appeal, the Supreme Court held that the combination of the two railroads "fetters the free and normal flow of competition * * * tends to monopolization [of the affected rail traffic]." United States v. Southern Pacific Co., 259 U.S. 214 at 229, 42 S.Ct. 496, at 498, 66 L.Ed. 907 (1922). The Supreme Court went on to say (259 U.S. at 230–232, 42 S.Ct. at 499) : "We reach the conclusion that the stock ownership in the Central Pacific acquired by the Southern Pacific is violative of the Sherman Act within the principles settled by this court * * * [which] collectively, establish that one system of railroad transportation cannot acquire another, nor a substantial and vital part thereof, when the effect of such acquisition is to suppress, or materially reduce the free and normal flow of competition in the channels of interstate trade." Following the remand of the *Southern Pacific* case, the C.P.R. and the S.P. applied for and received approval of their transaction by the ICC under section 5 of the Transportation Act of 1920. 76 I.C.C. 508 (1923). In United States v. Southern Pacific Co., 290 F. 443 (D.Utah 1923), the district court sustained the ICC's ruling and entered an order effectuating the transaction even though it found it to be in violation of the Sherman Act.

26. American Trucking Ass'n, Inc. v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed. 2d 1527 (1960) ; East Texas Motor Freight Line v. Frozen Food Express, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917 (1956) ; Ayrshire Corp. v. United States, 335 U.S. 573, at 592–593, 69 S.Ct. 278, 93 L.Ed. 243 (1949) ; United States v. Pierce Auto Freight Lines, 327 U.S. 515, at 535–536, 66 S.Ct. 687, 90 L.Ed. 821 (1946) ; Black Ball Freight Service v. United States, 223 F.Supp. 191 (D.Idaho 1963) ; Lester C. Newton Trucking Co. v. United States, 209 F.Supp. 600 (D.Del. 1962), aff'd, 372 U.S. 702, 83 S.Ct. 1017, 10 L.Ed.2d 124; Nashua Motor Exp., Inc. v. United States, 230 F.Supp. 646 (D.

We had felt that there is value in applying rational economic concepts embodied in modern sophisticated antitrust principles. This was what we undertook to demonstrate in our first opinion. However, as Justice Frankfurter aptly stated in his dissent in ICC v. J–T Transport Co., 368 U.S. 81 at 129–130, 82 S.Ct. 204, at 235, 7 L.Ed.2d 147, (1961),

> "An order of the Commission cannot stand, it is true, if we cannot tell what has been decided or if it leaves unclear the basis for its conclusions. United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 510–511 [55 S.Ct. 462, 467, 79 L.Ed. 1023]. Findings are no doubt judicially more persuasive the more felicitously they are formulated and the less they require extraction from a diffuse report. But the Commission is not under statutory duty to set forth its findings in serried array. It is the Court's duty to sustain the Commission's findings if, as here, there is no real difficulty in determining what was decided and on what grounds.

> "It is not the Court's function to impose our standards of lucidity or elegance in exposition upon the Commission."

This proposition is one of the things that the Supreme Court told us when it vacated our first decision in this case. Therefore, while rational economic principles contained in antitrust cases may aid us in pinpointing the danger areas, we may not require the ICC to travel to its conclusions only by this route.[27]

One example of the use of rational economic criteria should suffice to demonstrate the problems engendered by this case. *Brown Shoe* adopts these criteria (370 U.S. at 325–326, 82 S.Ct. at 1524):

[Product Market]

"*The outer boundaries* of a product market *are determined by the reason-* *able interchangeability of use or the cross-elasticity of demand* between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. [Citation omitted.] *The boundaries of such a submarket may be determined by* examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, *sensitivity to price changes,* and specialized vendors." (Emphasis added.)

The Court went on to define the Geographic Market (370 U.S. at 336, 82 S.Ct. at 1530):

> "The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market. * * * The geographic market selected must, therefore, both 'correspond to the commercial realities' of the industry and be economically significant."

Part of the confusion in the present case is occasioned by the assumption that *Brown Shoe* brought something new to the analysis of antitrust problems, i. e., markets, submarkets, geographic area analysis originated with the approach adopted by *Brown Shoe*. This idea is erroneous. The exact same definitional approaches were long ago adopted to test Sherman Act violations. United States v. Corn Products Refining Co., 234 F. 964 (S.D.N.Y.1916), 975–977 (per J. Learned Hand), appeal dismissed by agreement, 249 U.S. 621, 39 S.Ct. 291, 63 L.Ed. 805 (1919), cited United States v. Aluminum Company of America, 377 U.S. 271, 84 S.Ct. 1283 at 1286, n. 3. 12 L.Ed.2d 314 (1964). The only difference between the Sherman Act approach and

---

N.H.1964); Carolina Scenic Stages v. United States, 202 F.Supp. 919 (W.D.S.C. 1962); Ace Lines, Inc. v. United States, 197 F.Supp. 591 (S.D.Iowa 1960).

27. See United States v. Pierce Auto Lines, 327 U.S. 515 (1946). at 529, 523–533, 66 S.Ct. 687, 90 L.Ed. 821.

the Clayton Act approach is the quantum of effect necessary before a violation is proved.

 It is argued that the ICC's failure to utilize sophisticated antitrust market definition tools is evidence that it failed to properly assess the merger. This contention must be rejected. The ICC has never applied this approach formally, and yet, in spite of the fact that Judge Learned Hand used it as early as 1916, the Supreme Court has never considered this as evidence of the ICC's failure to properly consider a merger.

It may be helpful to apply this tool in the present case. Railroads have a decided economic advantage in carrying long-haul, heavy bulk products, e. g., phosphate rock mined principally in the western portion of central Florida. In terms of antitrust analysis, we submit that this service is a separate product market and Florida is the proper geographic area.

Some illustrations should demonstrate the point. Let us assume that railroads can haul phosphate rock 50% more cheaply than the next alternative mode of transportation, trucks. This means that if a truck could haul rock at $1 per pound, railroads could carry it at 50 cents per pound. Physically both of these services are interchangeable. If both modes set the price of hauling at $1, there would be "cross-elasticity of demand" between both.

However, if the railroad companies were owned separately from the trucks and if no products were available to bring a higher return and if space were available, railroads would set their price below $1 but above 50 cents, thus taking the business away from the trucks. Railroads are a submarket of long-haul, heavy, bulk products.

If there were competition by two or more railroads for the bulk business, the price would be set somewhere between $1 and 50 cents, but at such a price as would allocate the business between the roads based on market conditions. If, however, a monopoly is created, the monopoly may set the price at any level between $1 and 50 cents that will maximize its return, because it experiences no competition until the price reaches $1. The monopoly price may in fact be lower than the competitive price, depending on whether a change in the cost of transportation will appreciably affect the ultimate cost of the end product and thus increase or decrease its consumption. Thus a monopolist may pass on cost savings to achieve higher profits where a competitor will take the cost savings as higher profits without passing them on. The record in the present case gives us no data on which to predict what action will be taken by a railroad possessing a monopoly in the bulk-haul products market of central Florida.[28]

While railroads are able to take the long bulk-haul business from trucks, barges or water carriers enjoy a considerable cost advantage over railroads. Since shipment by barge takes longer than shipment by rail, the cheaper cost is somewhat offset. The record in this case does demonstrate that barges are not physically interchangeable with railroads as a major competitive mode of phosphate transportation. Barges are not able to serve interior points on phos-

---

28. With reference to revenue from phosphate rock, the Commission said (320 I.C.C. at 153):

"The competition faced by the railroads from other modes of transport in the Tampa area is most apparent with respect to the movement of phosphate rock. While the tonnage of phosphate rock rail shipments increased from 9.8 million tons in 1956 to 11 million tons in 1960, the revenue of the applicant railroads from phosphate rock was less in 1960 than in 1956 by approximately $1.1 million, or 4.5 per cent. This revenue decline is attributable in part to the fact that in 1960, the revenue per ton on phosphate rock was $2.21 as compared with $2.61 in 1956." This, of course, may only indicate that railroads have priced themselves at a level where cross-elasticity of demand with other modes of carriage will take place.

phate, nor are they able to serve facilities that have special equipment designed solely for loading or unloading rail shipments. See 313 I.C.C. 495 (1961) (railroads able to divert traffic from water carriers even at $1 higher rate than water transportation); 291 I.C.C. 689 (1954) (railroads able to divert traffic from water carriers even at 35 cents higher rate than water transportation). It is, we think, accurate to say that railroads enjoy a decided economic advantage over all other modes of transport on heavy, long, bulk-haul products in central and western Florida. Before we could assess the meaning of any such monopoly, we would have to know much more about the competition experienced by phosphate rock and its end-products. If there are readily ascertainable substitutes, even a monopoly as to phosphate rock might have little meaning. Compare the discussion of bulk, heavy-loading and low-rate coal by rail in Pennsylvania R. Co.-Merger-New York Cent. R. Co., 327 I.C.C. 475 (1966) at 516–517.

 The purpose of this example is to demonstrate that the plaintiffs' briefs are correct when they analyze the market structure and conclude that the merger, if allowed, creates a monopoly in parts of Florida and that that monopoly can have significant effects. But that is all market analysis shows. A careful reading of the ICC decision shows that the ICC clearly recognized this fact. The Commission referred to phosphate rock as "essentially a commodity normally handled by rail." 320 I.C.C. at 151. Throughout its report, the ICC recognized that a "monopoly" would be created in parts of Florida. It went on to say: "There is no question that there will be a significant reduction in rail competition in Florida." 320 I.C.C. at 166.[29]

---

29. In explaining the objections to the examiner's report, the Commission observed (320 I.C.C. at 139):

"Of these exceptions, many of which obviously overlap, the most important relate to the anti-competitive consequences of the merger upon the shipping public, communities, and competing railroads. Justice and others contend that the examiner failed to make appropriate findings with respect to the anti-competitive effects and monopolistic consequences of the merger in Florida and in the Southeastern States generally. Their main argument on this issue is that the merger would eliminate or substantially reduce competition and create a potential monopoly in the Southeastern States. * * * Justice emphasizes that the merged company would operate 81 percent of all the class I railway mileage in Florida and would control 54.52 percent of the total southern region class I railroad mileage."

And at 163, the Commission found: "In both the 6-and 8-State areas the merged company would have more than 54 percent of the total railroad mileage, while Southern, its nearest competitor, would have about 34 percent. In Florida the merged company would have approximately 81 percent of the railway mileage in the State." The Commission did go into more detail on Florida (320 I.C.C. at 164–66):

"The record here shows that rail competition will exist at every major city with a population in excess of 200,000 except at Tampa. The situation at Tampa and in the central and western portions of Florida is unique in that those areas are served by no other railroads except Seaboard and Coast Line. It is to be observed that in much of Florida, Seaboard and Coast Line heretofore have had what might be described as an imperfect monopoly, or an oligopoly if East Coast is included. On the basis of data contained in the the Official List of Open and Prepay Stations, 78 I.C.C. A–43, effective April 15, 1953, and considering only those points at which agents are maintained, Seaboard has been the only railroad serving approximately 60 points in Florida, whereas Coast Line has been the only railroad serving approximately 70 Florida points. Thus, the number of Florida points at which there has been no competition is about 4 times as great as the number of Florida points at which Seaboard and Coast Line have heretofore competed. In our opinion, the diminution of competition within the State of Florida that would result from the pro-

Therefore, the ICC reached the same conclusion that the application of *Brown Shoe* type analysis would have reached, even though the ICC did it in a practical, not a theoretical, manner. Once we accept the fact that the Commission saw this problem, we can set to one side the mechanics of antitrust law and look to the only real issue, the accommodation of the national antitrust policy with the national transportation policy.

As shown by the record, these railroads receive a substantial increment of their revenue from traffic originating in Florida. It is precisely on this traffic that the monopoly created by the merger will have its greatest impact.[30] The Commission appears to have assumed that the equivalent of a conspiracy to fix prices in Florida already exists. The Commission said (320 I.C.C. at 164–165): "It is to be observed that in much of Florida, Seaboard and Coast Line heretofore have had what might be described as an imperfect monopoly * * *. At most, the rail monopoly that would result from the merger in portions of Florida would merely supplant the dupoly which has long existed there * * *."

In Georgia v. Pennsylvania R. R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), the State of Georgia invoked the original jurisdiction of the Supreme Court with a complaint against 20 railroads. Georgia alleged that the railroads had conspired together, through

---

posed merger is largely a matter of degree. At most, the rail monopoly that would result from the merger in portions of Florida would merely supplant the duopoly which has long existed there and from which there have been no appreciable adverse competitive effects upon communities or the shipping public.

"Although the merged company would have a preponderance of the railway mileage in Florida, its lines would connect with other rail carriers in that State at the following points:

| | |
|---|---|
| "East Coast . . . . . . . . . . . . . . . . . | Benson Junction, West Palm Beach, Jacksonville, Lake Harbor, Marcy Miami. |
| "GS&F (Southern subsidiary) . . | Jacksonville, Crawford, Hampton, Lake City, Jasper, Lake Butler, Palatka. |
| "L&N . . . . . . . . . . . . . . . . . . . . . | Chattahoochee. |
| "Live Oak, Perry & Gulf (Southern subsidiary) . . . . . . . . | Live Oak, Perry, Slade. |
| "South Georgia (Southern subsidiary) . . . . . . . | Perry, Greenville. |
| "Southern Railway . . . . . . . . . . . | Jacksonville. |

"To illustrate further the anticipated effect of the merger upon the public in Florida, at the hearings in Tampa, the area in which the concern of monopoly is most prevalent, 19 shippers testified in support of the merger and 47 others would also have testified in support of it had the examiner not invoked the cumulative evidence rule. By contrast, only four shippers in the area testified in opposition to the merger. In any event, the percentage of railway mileage which would be operated by the merged company in Florida or the 6- and 8-State areas involved does not, standing alone, provide a suitable criterion for determining the sufficiency of the rail competition that would remain after the merger."

The Commission again noted the effect in Florida (320 I.C.C. at 211): "Except in portions of Florida, the overall reduction in rail competition in the Southeastern States will be relatively moderate and inconsequential when viewed in the light of the alternative rail service that will be provided by competitors of the merged company at most of the major industrial centers in the affected area."

30. As pointed out by the Southern Railway System at oral argument, nine bulk commodities handled by the merging railroads account for approximately 75–77% of their business. See dissent of Commissioner Webb, 320 I.C.C. 214, 230–32. The record does not show what portions of the merging companies' revnues or profits are generated by the carriage of long-haul bulk products originating in Central and Western Florida. Nor does the record show that effective competition for this type of carriage presently exists in Florida.

the use of rate bureaus, committees, conferences, associations, etc., to establish arbitrary and unreasonable rates to and from the State of Georgia. These conspiracies, it alleged, had eliminated substantially all rail competition. The Supreme Court held that Georgia could pursue its request for an injunction. What Georgia won in the Supreme Court, it promptly lost in Congress. The Reed-Bulwinkle Act explicitly exempts rate agreements and rate bureau accords approved by the ICC from the antitrust laws. 49 U.S.C.A. § 5b.

For our purposes, it is important to remember that the Reed-Bulwinkle Act preserves the potential of competition since individual railroad initiative is a legal requirement. If the instant merger is permitted, then that initiative will be irrevocably lost. Cf. Northern Securities Co. v. United States, 193 U.S. 197, 24 S. Ct. 436, 48 L.Ed. 679 (1904). (This case may be viewed as advancing the proposition that a merger to solidify a conspiracy is illegal under the antitrust laws.) This Court has absolutely no doubt that, judged by the standards of the antitrust laws, the instant merger would fail at least as to Florida. But whether this merger violates the antitrust laws by eliminating competition or potential competition is not the question before us.

The relationship of section 5 of the Interstate Commerce Act and the antitrust laws has been commented on by the ICC, the district courts and the Supreme Court on a number of occasions. In New York Central Securities v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138 (1932), the Supreme Court dealt with the predecessor of the present act, the Transportation Act of 1920. The ICC authorized the New York Central Railroad Company to acquire control, by lease, of the railroad systems of the Cleveland, Cincinnati, Chicago & St. Louis Railway, and the Michigan Central Railroad Company. A minority stockholder of each sought to attack the ICC's order. The authority to acquire control was sought on the ground that it would facilitate revision of routes, and the physical improvements needed for new routes, and would make possible important economies in operation. The question presented was whether the control granted was in the "public interest," and whether that term was so vague as to make it an unconstitutional delegation. The Court said (287 U.S. at 24–25, 53 S.Ct. at 48):

"Appellant insists that the delegation of authority to the Commission is invalid because the stated criterion is uncertain. That criterion is the 'public interest.' It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary. Going forward from a policy mainly directed to the prevention of abuses, particularly those arising from excessive or discriminatory rates, Transportation Act, 1920, was designed better to assure adequacy in transportation service. This Court, in New England Divisions Case, 261 U.S. 184, 189, 190 [43 S.Ct. 270, 273, 67 L.Ed. 605], adverted to that purpose, which was found to be expressed in unequivocal language: 'to attain it, new rights, new obligations, new machinery, were created.' The Court directed attention to various provisions having this effect, and to the criteria which the statute had established in referring to 'the transportation needs of the public,' 'the necessity * * * of enlarging (transportation) facilities,' and the measures which would 'best promote the service in the interest of the public and the commerce of the people.' Id. p. 189, note [43 S.Ct. p. 273]. See, also, Texas & Pacific Ry. Co. v. Gulf, Colorado & Sante Fe Ry. Co., 270 U.S. 266, 277 [46 S.Ct. 263, 70 L.Ed. 578]. The provisions now before us were among the additions made by Transportation Act, 1920, and the term 'public interest' as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential

conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred. \* \* \*"

In the view of the Supreme Court, "The public interest is served by economy and efficiency in operation." 287 U.S. 23, 53 S.Ct. 47.

In New York Central the carriers' lines were parallel and the plaintiffs argued that the acquisition would thus eliminate competition between the carriers. The Court answered (287 U.S. at 25–26, 53 S.Ct. at 48):

"The fact that the carriers' lines are parallel and competing cannot be deemed to affect the validity of the authority conferred upon the Commission. The Congress, which had power to impose prohibitions in the regulation of interstate commerce, Northern Securities Co. v. United States, 193 U.S. 197 [24 S.Ct. 436, 48 L.Ed. 679], had equal power to foster that commerce by removing prohibitions and by permitting acquisition of control where that was found to be an aid in the accomplishment of the purposes in view in the enactment of Transportation Act, 1920. See New York v. United States, 257 U.S. 591, 601 [42 S.Ct. 239, 66 L.Ed. 385]; Colorado v. United States, 271 U.S. 153, 165 [46 S.Ct. 452, 70 L.Ed. 878]. Exercising this paramount power, the Congress expressly provided in subdivision (8) of § 5, which has direct reference to subdivision (2), that 'the carriers affected by any order made under the foregoing provisions of this section' are 'relieved from the operation of the "antitrust laws," ' and 'of all other restraints or prohibitions by law, State or Federal, in so far as may be necessary to enable them to do anything authorized or required by any order made under and pursuant to the foregoing provisions of this section.' The question whether the acquisition of control in the case of competing carriers will aid in preventing an injurious waste and in securing more efficient transportation service is thus committed to the judgment of the administrative agency upon the facts developed in the particular case."

The principal precedent and first case to deal with the scope of review in the context of modern antitrust law was Associated Transport, Inc., 38 M.C.C. 137 (1942), injunction denied, McLean Trucking Co. v. United States, 48 F. Supp. 933 (S.D.N.Y.1942), aff'd, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944). The ICC authorized seven large motor carriers (originally Arrow Carrier was to be an eighth, but dropped out after the ICC approved the consolidation) to merge, forming the largest motor carrier in the United States and the only "end-to-end" motor carrier from New England to Florida.

In the course of three pages of generalized language, the ICC detailed the benefits which it believed would accrue from the merger (38 M.C.C. 143–146): 1. Consolidation would result in a higher load factor on vehicles with a concomitant reduction in the number of vehicles required for service. 2. Unified garage and testing facilities would lead to safer operation. 3. Vehicles could be shifted more readily from one end of the system to the other in order to meet peak demands. 4. In some cities terminals could be consolidated; additional terminals could be established where before there was not enough traffic for any one of the companies to establish a terminal. 5. Relations with shippers and public regulatory bodies would be simplified. 6. Tracing of shipments and settlement of claims would be facilitated. 7. Economy would result by combining administration. The Commission concluded (38 M.C.C. 146):

"We find: That the consolidation would result in improved transportation service, and that through movement of freight would be simplified and expedited, equipment would be more efficiently utilized, terminal fa-

cilities would be improved, the handling of shipments would be reduced, relations with shippers and public regulatory bodies would be simplified, and safe operation would be promoted."

In the present case the ICC considered the benefits more carefully than in *Associated*, but concluded that they were present, citing almost the same factors. The ICC found the following benefits: 1. Consolidation of stations and terminals. 2. Consolidation of switching facilities and elimination of yard engines and yard diesels. 3. Consolidation would result in higher load factor on freight trains between major terminals with a concomitant reduction in the number of trains required. 4. Economy would result by combining administration. 5. Unified repair shops would result in more economical and safer operation, including the reduction of stores facilities (320 I.C.C. 154–59). The Commission concluded (320 I.C.C. 160–61):

> "In addition to the specific benefits above discussed, many other benefits can reasonably be expected to result from the elimination of wasteful and duplicative facilities and an *overall* (sic) improvement in operations. These benefits can be grouped as follows. In the area of improved service, it can be anticipated that benefits will be derived from (1) more flexible schedules and more direct routes; (2) the elimination of interchanges and delays in transit; and (3) the simplification of transit arrangements and greater flexibility in arranging stopoff points. Reduction in shipping costs can be anticipated from the elimination of wasteful and unneeded transport facilities, the substitution of single-line rates on certain commodities, and the elimination of certain switching charges. A more adequate car supply, the availability of more specialized equipment, and more efficient utilization of equipment should result. There also are a number of advantages in dealing with a single corporate entity, such as convenience in the settlement of claims and the tracing of cars. Additionally, the merged company will make a significant contribution to the economic and industrial development of the Southeastern States through the promotion of new industrial sites, improvements in port terminal facilities, and in the stabilization of employment which will flow from greater financial stability of the merged company."

If it were only necessary that the Commission find what it perceived to be benefits "securing more efficient transportation service," our inquiry would be at an end. The ICC's decision is no more vague or speculative in the present case than it was in *Associated*.

One real difference between *Associated* and the instant case is in the facts surrounding the post-merger competitive picture. In their first brief, filed June 8, 1964, the United States cites Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904) and its progeny for the proposition that "elimination of competition between Seaboard and Coast Line" violates the antitrust laws and is so significant that it prevents the ICC from allowing a merger. Clearly, the Government is correct that the elimination of significant competition, as here, violates the antitrust laws. But *New York Central Securities*, supra, 287 U.S. at 25, 53 S.Ct. 45, 77 L.Ed. 138, cites *Northern Securities* to demonstrate that Congress had power to authorize the ICC to waive the antitrust laws and allow a combination that would eliminate significant competition between the parties.

*Associated* clearly authorizes the ICC to eliminate competition between the parties to the merger. In answering a contention by the Antitrust Division similar to that made in the present case, the ICC said (38 M.C.C. at 150):

> "Undoubtedly, *substantial competition exists between certain of the carriers involved, and consummation of the instant transactions would eliminate such competition.* However, such fact alone is not controlling. We are

unable to agree with the argument of the Antitrust Division that it was the intention of Congress in enacting section 5 that we approve only such transactions as would not result in an 'unreasonable' restraint of competition within the meaning of the antitrust laws, *regardless of benefits that might result or the adequacy of remaining competition.*" (Emphasis added.)

The Commission stated its understanding of the test to be applied as follows (38 M.C.C. at 150–151):

"In our opinion, the Congress intended to place wholly within our judgment the granting or denying of authority for these transactions under section 5. The specific reference to the antitrust laws only emphasizes the Congressional intent that we should be empowered to approve transactions which otherwise would be violative of the antitrust laws, if we are convinced that the public interest would thus be best served. Stated differently, section 5 authorizes us to permit unifications which would, except for such approval, result in restraining competition contrary to the antitrust laws, where the disadvantages of such restraint are overcome by other advantages in the public interest, such as direct betterment in the public service of the carriers or indirect betterment through stabilization of the industry. Determination of the larger question as to whether the proposed unification would be consistent with the public interest involves consideration not only of the competition that would be eliminated, but also of the competition that would remain, and the advantages which would result from the unification."

Therefore, the affirmance of these principles in operation by both the district court and the Supreme Court should put to rest the argument that the elimination of competition between the parties is in itself enough to prevent an ICC approved merger where sufficient outside competition remained.

Before reaching the crux of the matter, "the competition that would remain," one other issue must be dispatched. The Government argues that the present merger is different in that it involves two healthy, stable railroads and not a failing company. *Associated* involved not only seven healthy trucking companies, but probably seven of the most healthy trucking companies in the United States. The national transportation policy and the Commission have always looked at benefits going far beyond the saving of a failing company. By restricting their authority to such companies, we would allow them to approve only those mergers that do not violate the antitrust laws. So far no court has been willing to take such a position and the Supreme Court has rejected it specifically. McLean Trucking Co. v. United States, 321 U.S. 67 at 85–86, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

The major difference between the record in *Associated* and that in the instant case is the substantial competition that remained after the merger in *Associated*. The Commission divided the Eastern United States into three regions—New England, Middle Atlantic, and the South. The ICC then analyzed the remaining competition in each of these regions in great detail. The Commission's analysis is subject to some criticism but it does show that substantial intramodal competition remained. The Commission concluded (38 M.C.C. at 159–160):

"The foregoing clearly shows that, if the proposed transaction is consummated, there would remain ample competitive motorcarrier service throughout the territory involved. In addition, all of the principle points and many others are served by one or more rail carriers. Competition is also afforded by motor-vehicle contract carriers and by carloading and forwarding companies."

The ICC also recognized that trucking, unlike railroading, was an industry affording ease of entry. 38 M.C.C. at 161. It should be apparent that there are two

important differences between *Associated* and the present case—ease of entry and remaining competition.

The district court in *McLean* refused to enjoin the ICC order approving the *Associated* merger, explaining the problem of accommodating the antitrust laws and the Interstate Commerce Act as follows (48 F.Supp. 933 at 936 (S.D. N.Y.1942):

> "Considerable light will be thrown on this problem at once by noticing the plain fact that while the Antitrust Acts and the Interstate Commerce Act are designed to bring about the conduct of business for the common good the former are also penal and are aimed at the evils of monopolies as such which unreasonably restrain trade or business while the latter, though it does not disregard such evils, is primarily concerned with creation and maintenance of adequate transportation service to the public."

The court went on to say (48 F.Supp. at 937):

> "What is needed for adequate service is a matter for the Commission to decide and it is likewise free to decide what amount of competition is in furtherance of the public interest and what is not. It is not bound to preserve or foster competition to a degree that will not best serve the public interest from the standpoint of adequate public transportation service and whether competition as such is adequate or not must depend upon its effect in furtherance of the attainment of the ends Congress sought to accomplish under the Interstate Commerce Act administered by the Commission. * * *
>
> "* * * We cannot review the weight of the evidence or the wisdom of the order."

In affirming the district court, the Supreme Court recognized that the merger would eliminate competition between the parties. McLean Trucking Co. v. United States, 321 U.S. 67 at 71, 64 S.Ct. 370, at 372 (1943).

The Supreme Court said (321 U.S. at 76, 64 S.Ct. at 375):

> "In passing upon a proposed consolidation the Commission is required to 'give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; * * * (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected.' Section 5(2) (c). The foregoing provisions supply the general statutory standards for guiding the Commission's judgment; *and within their broad limits, its authority is 'exclusive and plenary.'* § 5(11)." (Emphasis added.)

In discussing the accommodations of the antitrust laws and the Interstate Commerce Act, the Court said (321 U.S. at 85, 64 S.Ct. at 379):

> "And in authorizing those consolidations it did not import the general policies of the antitrust laws as a measure of their permissibility. It in terms relieved participants in appropriate mergers from the requirements of those laws. Section 5(11). In doing so, it presumably took into account the fact that the business affected is subject to strict regulation and supervision, particularly with respect to rates charged the public—*an effective safeguard against the evils attending monopoly,* at which the Sherman Act is directed." (Emphasis added.)

Later the Court explained (321 U.S. at 86, 64 S.Ct. at 380): "Congress recognized that the process of consolidating motor carriers would result in some diminution of competition *and might result in the creation of monopolies.*" (Emphasis added.) The Court says to "prevent the latter effect" the Commission was given "power to control such developments." One interpretation of this wording is that the Commission cannot allow monopolies to be formed. But the words are subject to a different explanation. The use of the word "effect" may mean the Commission's power to regulate mo-

**1012**

nopoly power, not a prohibition of the creation of any monopolies. The Commission was given broad, plenary powers and was to look at mergers as a part of the "national" transportation problem. Thus, there could be local or limited monopolies so long as they were controlled and contributed to the attainment of the national transportation policy objectives. Therefore, a limited monopoly, such as the one in the present case, might be allowed.

The Commission is to weigh, "as an administrative matter," "the effect of the merger on competitors and on the general competitive situation in the industry." As the Supreme Court said (321 U.S. at 87, 64 S.Ct. at 381):

> "Resolving these considerations is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. Congress left that task to the Commission 'to the end that the wisdom and experience of that Commission may be used not only in connection with this form of transportation, but in its coordination of all other forms.' 79 Cong.Rec. 12207. 'The wisdom and experience of that commission,' not of the courts, must determine whether the proposed consolidation is 'consistent with the public interest.' [Cites omitted.] If the Commission did not exceed the statutory limits within which Congress confined its discretion and its findings are adequate and supported by evidence, it is not our function to upset its order."

In the instant case, the Commission looked at and weighed all the factors it had examined in *Associated*. It is this weighing of factors and not the result that the statute compels.[31] The ICC considered those areas in Florida where a monopoly would be created, including the size of the cities involved and their relative importance. If we say that the Commission may do this where competition remains but not where some monopoly areas are produced, we will create an anomolous situation. Section 1 of the Sherman Act makes combinations in restraint of trade unlawful. The transactions involved in *New York Central Securities*, supra, and *Associated-McLean*, supra, by restraining trade would possibly violate Section 1, and on a proper finding, as there made, the Commission could waive this violation. Section 2 of the Sherman Act makes attempts to monopolize illegal. Therefore, to strike down the Commission's action in the instant case will, in effect, say it can waive Section 1 of the Sherman Act or the more stringent Clayton Act, but not Section 2 of the Sherman Act. Nothing in the legislation admits that interpretation. Compare the situation where the ICC grants the right to extend rail service to newly-discovered phosphate deposits to one railroad but not to its competitor. Atlantic Coast Line R. R. v. United States, 243 F.Supp. 945 (E.D.Va.1965).

At oral argument the government attempted to clarify its "failing company" proposition. Counsel explained that not all healthy competitors should be prevented from merging. It was explained that the government's position really was that where two healthy competitors are involved economies or "dollar savings and other alleged benefits, transportation, service, and such other things" should *never* be enough to overcome severe "elimination of competition," such as here involved. This argument is cogent, and if made before the Commission would doubtless be given weight.[32] It

---

31. Cf. Ayrshire Corp. v. United States, 335 U.S. 573 at 592–593, 69 S.Ct. 278, 93 L.Ed.2d 249 (1949), quoted supra, n. 18.

32. Cf. the Commission's statement in Great Northern Pacific & Burlington Lines, Inc.—Merger—Great Northern Railway Co., I.C.C. (1966) (F.D. No. 21478) ms. p. 90:

> "The second general observation we wish to make is that the financial strength of the applicants is not a bar to merger. Cf. Norfolk & Western Ry. Co. and New York, Chicago & St. Louis Ry. Co.—Merger, 324 I.C.C. 1 (1964). Section 5(2) of the Act is not limited to transactions involving a union of the weak and the weak, the strong

distinguishes the *Associated-McLean* case, supra, where substantial competition remained. But this argument cannot, as a matter of law, be used to rewrite the statute.

Congress has directed the ICC to give primary weight to four factors. McLean Trucking Co. v. United States, 321 U.S. 67 at 76, 64 S.Ct. 370, at 375, 88 L.Ed. 544 (1943) (quoted supra, p. 1011). To allow the government's argument to override those statutory standards even when the Commission has carefully applied them and found the merger justified would be, as the Supreme Court said in ICC v. J–T Transport Co., 368 U.S. 81 at 89–90, 82 S.Ct. 204, 7 L.Ed.2d 147, (1961), equivalent to loading the scales in favor of but one factor.

In the present case it may not be entirely accurate to refer to Seaboard and Atlantic as financially healthy railroads. The Commission found (320 I.C.C. at 149): "While the past earnings record of both Seaboard and Coast Line is impressive, their rate of return has not been significantly high. Although it is above the average norm for class I railroads, it does not compare favorably with returns on investments in other industries or in other modes of transport." The ability of railroads to earn a rate of return sufficiently high to enable them to obtain funds for needed facilities in the capital market is a subject to which Congress has specifically directed attention. Congress in 1958 passed legislation designed to make funds available to railroads by allowing the ICC to guarantee loans in the aggregate amount of 500 million dollars. 49 U.S.C.A. § 1231, et seq.[33]

In describing the significance of Congress' action, the courts have said (Southern Railway Co. v. United States, 167 F.Supp. at 754 (M.D.Ga.1958): "The whole import of this legislation is that funds for the development of needed facilities for the railroads are not available at current interest rates or in the capital market from ordinary commercial sources." Given this background, we must conclude that the ICC has broad discretion in determining how financially healthy railroads should be before their merger ceases to be in the public interest.

Minneapolis & St. Louis R. Co. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959), is of little help to the plaintiffs. That case did little more than repeat what was said in *McLean Trucking,* supra. In *Minneapolis,* the ICC had to choose between two possible mergers. The Supreme Court agreed that the ICC was correct in choosing the merger that maintained the greatest degree of competition. In the instant case there is no choice between equally advantageous mergers. If there is to be any "benefits" at all, competition must be reduced.

In our opinion, the ICC has clearly realized the danger zones in this merger and after analyzing the problem has chosen what it concludes to be more important public benefits.[34] The voluminous record amply supports its findings. The greatest problem that we have ex-

---

and the weak or the large and the small. On the other hand, the prosperous condition of the major applicants is a highly material fact. Where carriers are so impoverished that they are unable, individually, to constantly improve their transportation services and facilities, the public interest involved in a pooling of their resources is obviously stronger than in a case where, as here, the applicants are financially able to improve their plants and facilities in step with advances in rail technology."

See also the Commission's Discussion I.C.C., ms. pp. 96–97.

33. See 1958 U.S.Code Cong. & Admin.News, p. 3456, for the legislative history of the Transportation Act of 1958. The Commission has now guaranteed loans in the aggregate of about 225 million dollars.

34. "We have carefully evaluated the effects of the curtailment of competition that will result from the merger and when considered in connection with the advantages of the merger, including improved services, safer operations, and lower costs, we are convinced that the advantages of the merger far outweigh the potential disadvantages." 320 I.C.C. at 212.

perienced is that none of the plaintiffs in this case chose to build a record before the Commission on which to support their contentions.

Before this Court the government has presented able arguments. Had these been made before the Commission and had the government availed itself of the opportunity to build a record showing the basic facts it claims could be shown, this record might be made to tell a different story.

The government intervened before the ICC on the grounds that this merger was inconsistent with the antitrust policy of the United States. It was admitted at oral argument that out of 35 hearing days, the government managed to be represented only on 5 days. The government asked for an opportunity to have a special hearing at which it desired to produce evidence to support its contentions. The Commission granted that request and set a hearing in Washington, D. C. The government then decided not to present any evidence.

In reaching the conclusion that this merger was in the public interest, the ICC reviewed at some length the competitive growth of other modes of transportation and their impact on the rail industry. The Commission voiced the railroads' contentions as follows (320 I.C.C at 151):

"* * * the applicants emphasize that the railroads have not participated proportionately in the country's economic growth, and that competition from other modes of transport contribute to a large extent to the financial problems now plaguing the railroad industry."

The ICC went on to announce its policy on intermodal competition in the following terms (320 I.C.C. at 166–167):

"While we recognize in general the desirability of preserving intramodal rail competition, it is no longer the all-important factor that it once was in the days when the railroads had a virtual monopoly in all inter-city freight traffic. With the development of intense competition in recent years from other modes of transport, the preservation of intramodal rail competition has lost much of its significance in the furtherance of the overall national transportation policy. Even after the merger herein is approved, effective competition among railroads will continue in most of the major industrial centers. * * *

"In other regulated industries, typically gas, electric, and telephone utilities, a single company frequently serves large metropolitan areas and often even significantly larger geographic or market areas. As public utilities are affected with a public interest and are essentially monopolistic by nature, they are subjected to strict regulation and supervision by State and Federal regulatory agencies. Under regulation, their services, as a general rule, are efficient and reasonably priced despite the absence of competition. While exact comparability does not exist between railroads and public utilities generally, it must be recognized that railroads are subject to equally stringent regulation. Moreover, as railroads have the basic economic characteristics of public utilities and are subject to regulation in the public interest at both the Federal and State levels, it is not realistic to insist that intramodal rail competition must be preserved at all places, at all times, and under all circumstances. For these reasons and weighing all the factors previously discussed, plus the further consideration that railroads today encounter increasingly strong competition from other modes of transportation, we conclude and specifically find that (1) the reduction of rail competition caused by the proposed merger will not be substantial; (2) ample competitive rail service will remain after the merger throughout most of the affected area, and (3) such reduction in competition as will result from the merger will have no appreciably injurious effect upon shippers and communities."

Thus, the ICC in an attempt to insure "adequate transportation service to the public" has focused on that phase of the transportation problem President Kennedy emphasized in his transportation message to Congress—*inter*modal competition.[35] The Commission reasoned that to maintain healthy railroads in the long run, it must foster competition at that level where it will have its most decisive effect. It reasoned that it could waive the antitrust laws where they prevent a rational transportation policy, and here it did waive those laws. The Commission took the position that the greatest good came from increasing competition in the Southeast as opposed to maintaining it in but a part of Florida. The plaintiffs object to these policy determinations because in their view they allow the Commission to resort to a broader statistical universe that minimizes the anticompetitive impact.

Of course, if judicial review is to have any meaning, extension of principles to meet new situations, such as the new policy on intermodal competi-

tion announced here, must be based on some minimum demonstration to the courts that the Commission has relied on relevant criteria to conclude that the new policy is in the public interest. Such a demonstration was made here. The Commission reviewed the impact of other modes of transportation on railroads. The ICC looked at the long-run needs of the different areas of the South to determine which was most important. We cannot say that based on this record a reasonable man could not reach the same conclusion which the Commission has reached.[36] Nor can we say its policy is inconsistent with the scheme of the regulatory statute. In short, nothing in the record before us indicates that the action taken by the Commission in accommodating the antitrust laws and the Interstate Commerce Act is arbitrary or capricious. That we may not have reached the same conclusion does not make the ICC wrong.[37]

Plaintiff, Florida East Coast Railway, attacked the protective provi-

**35.** 1962 U.S.Code Cong. & Admin.News, p. 4148, 108 Cong.Rec. 5509 (H.Doc. No. 384), Message of April 8, 1962; see also House Rep. No. 1922, 1958 U.S.Code Cong. Admin.News, pp. 3456, 3469–3471; 1955 Weeks Committee Report (Presidential Advisory Committee on Transport Policy and Organization).

**36.** It is not our function to decide whether the Commission's conclusions as applied in this case were wise. It may be that more, not less, intramodal competition was needed in Florida. We are not at all certain that the government, had it availed itself of the opportunity provided, could not have shown how ineffective intermodal competition is in Florida. But the Commission went so far as to conclude that a monopoly in Florida was not too high a price to pay for increased intra and intermodal competition in the southeastern part of our Nation where improved transportation is needed. This was not an unreasonable conclusion for one to reach after reading the record in this case.

**37.** See Ayrshire Corp. v. United States, 335 U.S. 573 at 592–593, 69 S.Ct. 278, 93 L.Ed. 243 (1949); United States v.

Louisville & Nashville R. Co., 235 U.S. 314, 35 S.Ct. 113, 59 L.Ed. 245 (1914); Gray v. Macy, 239 F.Supp. 658 (D.Or. 1965); Consolidated Freightways v. United States, 83 F.Supp. 811 (E.D.Wash. 1949); Assigned Car Cases, 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204 (1927); United States v. Chicago Heights Trucking Co., 310 U.S. 344 at 352–354, 60 S.Ct. 931, 84 L.Ed. 1243 (1940); United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946); United States v. New River Co., 265 U.S. 533, 44 S.Ct. 610, 68 L.Ed. 1165 (1924); Black Ball Freight Service v. United States, 223 F.Supp. 191 (D.Idaho 1963); Cardinale Trucking Co. v. United States, 232 F.Supp. 339 (N.N.J.1964); National Motor Freight Traffic Ass'n v. United States, 242 F.Supp. 601 (D.D.C. 1965); Willey v. United States, 245 F. Supp. 669 (E.D.Ill.1965); Legge v. United States, 244 F.Supp. 878 (W.D.Pa.1965); Florida East Coast Ry. Co. v. United States (I), 242 F.Supp. 14, rev. on other grounds, 382 U.S. 154, 86 S.Ct. 277, 15 L.Ed.2d 223 (1965); Atlantic Coast Line R. Co. v. United States, 243 F.Supp. 945 (E.D.Va.1965).

sions announced by the ICC to shield this plaintiff from the effects of the merger. Businessmen, like government agencies, talk about business in the flowing terms that generals reserve for their favorite war maneuvers. As a Nation, we find ourselves today involved in a "war in Viet Nam," a "war on poverty," a "war on ignorance," et cetera. The ICC is no exception to this masculine jargonic function. In speaking of East Coast's ability to survive any aggressive tendencies of the newly-merged railroad, the Commission spoke of its "potentially strong counteroffensive weapon."

At oral argument the FEC bitterly attacked the use of such language, asserting it was devoid of any real substance and so were the protective provisions. The retaliatory language used by the Commission is expressive and to that end acceptable. In short, Southern and the FEC would have us substitute our ability to predict future effects for that of the Commission. The ICC is far more experienced in this area than any one given court. The Commission, and not we, must tailor the protection to fit its expert prediction of the future. On this record, we are in no position to say that its careful study has led to capricious results. When not plainly unreasonable, we must leave to the agency vested with congressionally assumed expertise this type of decision.[38] The question boils down to whether the ICC acted wisely in not providing more protection. Statutorily we are not the all-wise of this field, and, while our crystal ball might indicate a different result than that of the Commission,[39] the record in this case supports its action.

The Commission determined that subsequent to the merger Mercantile-Safe Deposit and Trust Company[40] would have "power to control the merged company." 320 I.C.C. at 197. In reaching this ultimate conclusion the Commission detailed the relationship between Mercantile, Coast Line Company, the Louisville & Nashville Railroad, and the merging carriers. 320 I.C.C. at 142, 193–97.

By a combination of direct and indirect stock control, Mercantile will have control over the largest single block of stock in the merged company. The Commission's primary factual findings are supported by substantial evidence in this record. Its ultimate conclusion that control will result is a reasonable one, well within the province of its statutory power.

The Commission also concluded that (320 I.C.C. at 197):

> "Mercantile is an investment company engaged exclusively in the banking and trust business. Its direct interest in the merged company is merely incidental to its primary business of managing trusts and estates."

Section 5(3) permits the ICC "to the extent" it deems appropriate to designate a person who is not actually a carrier as a carrier for the purpose of the Interstate Commerce Act, if such person is authorized to acquire control of an actual carrier in a transaction approved under section 5(2). Under section 5(3) it is clear that the ICC need not designate every person obtaining such control as a carrier. United States v. Marshall Transport Co., 322 U.S. 31, 41, 64 S.Ct. 899, 88 L.Ed. 1110; Wellsville A. & G. Corp., Purchase and Control, 295 I.C.C. 115, 129.

---

**38.** See n. 37, supra.

**39.** The Commission concluded (320 I.C.C. at 188):
"It is important to note that the conditions we have devised represent neither mere acceptance of the minimum concessions offered by the applicants nor full acquiescence in the demands of the intervening railroads, but rather are the product of our exhaustive study of the competitive situation in the Southeast. We are convinced that these routing and gateway conditions will establish two balanced competitive systems in that area and will result in an increase rather than decrease in intramodal rail competition that will contribute to the present and future economic development of this important section of the Nation."

**40.** Hereafter Mercantile.

Under the "circumstances" of the instant case, the Commission decided not to exercise its section 5(3) power. The Commission's primary factual findings as to the character of Mercantile's activities are supported by substantial evidence in this record. We see no abuse of discretion in the Commission's ultimate conclusion based on those primary facts.

The Commission noted that the merger will have substantial adverse effects upon many railroad employees and their families, but in the long run the merger will provide greater job security and more stabilized conditions of employment for employees of the merged company. See 320 I.C.C. at 200. Approximately 4,257 jobs will be abolished and the location of employment will be changed for 4,439 other employees. 320 I.C.C. at 154. One of the four primary criteria to which section 5(2) (c) directs the ICC's examination is "the interest of the carrier employees affected" by the merger.

In our first opinion, since we remanded the case to the ICC for further proceedings, we did not find it appropriate to reach the question of employee protection. The policy adopted by Congress clearly contemplated that the accomplishment of economies and improved transportation through consolidation of the Nation's rail carriers will have an impact upon rail employees. In section 5(2) (f), Congress provided for the protection of employees by the Commission. No merger may be approved that does not provide for "a fair and equitable arrangement to protect the interests of the railroad employees affected." Moreover, Congress provided that the Commission must insure "that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers * * * being in a worse position with respect to their employment."

The intervening plaintiff, Railway Labor Executives' Association,[41] bitterly attacks as inadequate the protective conditions adopted by the ICC. In the instant case the Commission adopted the protective conditions it announced in Southern Railway Co.-Control-Central of Georgia Ry. Co., 317 I.C.C. 557, 729, 320 I.C.C. 377. The Association paints a sorry picture of confusion and utter chaos which it claims shrouds the Southern Railway conditions.

The Association points out that the Southern Railway conditions were imposed in a "control" case and argues that they cannot rationally be applied in a consolidation case. This contention is without merit. The problem created by acquisition of control or merger from the standpoint of affected employees is identical. This fact is amply demonstrated by the expected problem discussed by the district court which reviewed the Southern Railway conditions. That court commented (Railway Labor Executives Ass'n v. United States, 226 F.Supp. 521 at 522, (E.D.Va.1964) vacated on other ground, 379 U.S. 199, 85 S.Ct. 307, 13 L.Ed.2d 338 (1964)):

> "The Commission, in approving the transaction, was fully advised of the proposed consolidation of Central's freight agencies, yards, shops and accounting department into those of Southern, together with the resultant job losses entailing substantial hardship to many employees and their families. In the alleviation of these hardships the Commission imposed conditions for the protection of the employees thus affected, which it determined more than met the statutory requirements of Section 5(a) (f) and would be fair and equitable."

The major argument of the Association is that the Southern Railway conditions are confusing and inadequate. The Southern Railway conditions codify the labor conditions previously employed by the Commission and are intended to provide a shorthand means of referring to those conditions when cited in cases such as the present merger. The basic em-

ployee protection conditions may be traced to the ICC's 1941 decision in Texas & P. Ry. Co. Operation, 247 I.C.C. 285. That decision set forth conditions to protect affected employees who were displaced or dismissed during the four-year period following the effective date of the Commission's order.

In Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177 (1944) at 199–201, the ICC refined the protection contained in the Texas & P. conditions. Employees receiving the Oklahoma conditions were, in addition to the Texas & P. conditions, allowed moving expenses and losses on the sale of homes. The Southern Railway conditions in Article I carry forward the Oklahoma conditions as the Commission's basic four-year protective provisions.

In the New Orleans Union Passenger Terminal case, 282 I.C.C. 271 (1952), the Commission went a step further and extended financial compensation beyond the four-year period provided in the Oklahoma conditions. These protections are carried forward in Article II of the Southern Railway conditions. Thus, employees who are first affected during the first five years [42] after the effective date of the Commission's order are protected until they obtain the full benefits of what is called the Washington Agreement.[43] Moreover, the Southern Railway condi-

tions provide a stronger arbitration provision than did earlier provisions.

The Association seems to place a strained interpretation on the Commission's action. After reading the ICC's decision in this case and reviewing the background of the Southern Railway conditions, we do not think the Association's interpretation should prevail. Nor do we think there is merit in the argument that the Association never had an opportunity to argue against the Southern Railway conditions.

The Association had ample opportunity to argue for conditions it thought appropriate, and did in fact argue for an attrition clause. We must realize that the Commission's citation of the Southern Railway conditions is just a shorthand method of saying that, after consideration of all arguments, it applies the same conditions here as in Southern.

Some confusion may be engendered by the fact that the Virginia court [44] construed the Southern Railway conditions more narrowly than the Commission later said it had intended. The Commission has now abandoned any contention that it only went as far as the Virginia court thought, and we should not be confused by that interchange of occurrences. Read carefully and applied rationally, the use of the Southern Railway conditions in this case need cause no confusion.[45]

42. This was conceded by the ICC's General Counsel at oral argument when he said: "In other words, we say that the employees first affected in the fifth year after the effective date of the Commission's Order get the same Washington agreement protection that they would have obtained under the New Orleans conditions. Nothing has been taken away from such an employee." (R. p. 143.)

43. The "Washington Agreement," or the "Agreement of May 1936, Washington, D.C.," as it is sometimes called, is an agreement that was entered into by virtually all the railroads and railroad unions in the United States. This collective bargaining agreement provides some protection to employees affected by "coordinations" of facilities between two or more carriers. The Supreme Court ordered the Commission to clarify the relationship of the Southern Railway con-

ditions and the Washington Agreement in Railway Labor Executives' Association v. United States, 379 U.S. 199, 85 S.Ct. 307, 13 L.Ed.2d 338 (1964). See Pittsburgh & Lake Erie Railroad Co., a Delaware Corporation—Merger—Pittsburgh & Lake Erie Railroad Co., a Pennsylvania Corporation, 324 I.C.C. 198 (1964), at 204; Atchison, Topeka & Santa Fe Railway Co.—Merger—Gulf, Colorado & Santa Fe Railway Co., 324 I.C.C. 254 (1965), at 260–61.

44. Railway Labor Executives' Ass'n v. United States, 226 F.Supp. 521 (E.D.Va. 1964), vacated in part, 379 U.S. 199, 85 S.Ct. 307, 13 L.Ed.2d 338 (1964).

45. See, for example, Atchison, Topeka & Santa Fe Railway Co.—Merger—Gulf, Colorado & Santa Fe Railway Co., 324 I.C.C. 254 (1965), at 260–61 (clarifying the use of such terms as "home road" in the Southern Railway conditions).

After carefully examining the contentions of Railway Labor Executives' Ass'n, the Commission concluded (320 I.C.C. at 201):

"We are unable to conclude that conditions requiring the retention of unnecessary employees in unnecessary positions [or the equivalent alternatives suggested by the Association] would be consistent with the public interest or sound business policy. The imposition of such conditions would unduly restrict carriers in the establishment of more economical operations, and would be in conflict with the objectives of the national transportation policy."

Based on the record in this case, we cannot say that the Commission's action has created inequitable or unfair labor conditions. What was said in Brotherhood of Maint. of Way Employees v. United States, 221 F.Supp. 19 (E.D.Mich.1963) at 29, aff'd, 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270 (1963), is applicable here:

"It is recognized that even though there will be some immediate hurt to railroad employees in the approval of mergers and affiliations, railroad employees, as well as all other members of the public, will, in the long run, find more and better opportunities if the country's total economic health is protected. We cannot say that the conditions imposed by the Commission do not adequately protect the rights of the employees in this situation."

 The Association also argues that the ICC misconstrued its statutory authority in one important respect. As the Association reads the words "employees of the carrier or carriers by railroad affected," the statute requires the Commission to protect not only the employees of the merging roads but also the employees of their competitors who may be affected.

The Commission has consistently construed this language as only requiring protection for the employees of carriers involved or participating in the transaction.[46] This consistent practice lends weight to what seems the logical interpretation of the statute. Taken in context, the provision is but one of many dealing with the Commission's treatment of merger applicants. When Congress spoke of "carriers" in section 5(2), it referred to the participants. For example, in section 5(2) (a) (i) the statute required ICC approval for "two or more carriers to consolidate or merge." In section 5(2) (c) the statute speaks of the "interest of the carrier employees affected," obviously meaning participating carrier. And when Congress wished to refer to nonparticipating carriers in 5 (2) (d), it said "another railroad or other railroads." Taken in context, we think it clear that the "carrier or carriers" referred to in section 5(2) (f) are the carriers involved in the merger and most immediately affected by the Commission's action. We, therefore, hold that the statutory protection requirement is restricted to the carriers involved in the transaction.

We conclude that in formulating employee protection the Commission has not transcended its statutory bounds. Based on the record in this case, we also conclude that the Commission in approving this merger has not failed to "give weight to" "the interests of the carrier employees."

 After considering the arguments which we have discussed and all other arguments in this case, we conclude that the ICC explained its reasoning and supported its application of that reasoning by substantial evidence. Since the ICC correctly applied the proper standards and thus exhibited that familiarity with the complex problems in the transportation industry which Congress anticipated the ICC would achieve from its particularized experience, we must and do sustain its order. The injunction prayed for is therefore denied.

District Judge SIMPSON concurs in the result.

---

46. See Detroit, Toledo & Ironton Railroad Co.—Control—Ann Arbor Railroad Co., 320 I.C.C. 325 (1964); Texas & Pacific Railway Co.—Control—Kansas, Oklahoma & Gulf Railway Co., 324 I.C.C. 309 (1964), at 339.